EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------x
                                   :
                                   :
In re:                             : Chapter 11
                                   :
WINSTAR COMMUNICATIONS, INC., et al., : Case No.: 01-1430 (JJF)
                                   :
                                   : Jointly Administered
         Debtors.                  :
                                   :
                                   :
                                   :
------------------------------------------------------x
```

**ORDER AUTHORIZING (i) SALE OF CERTAIN OF THE DEBTORS'
ASSETS FREE AND CLEAR OF LIENS, CLAIMS ENCUMBRANCES,
AND INTERESTS, (ii) APPROVING CURE AMOUNTS WITH RESPECT
TO CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
(iii) AUTHORIZING THE DEBTORS TO ENTER INTO AND APPROVING
MANAGEMENT AGREEMENT, (iv) APPROVING REGULATORY
TRANSITION PROCESS AND (v) GRANTING RELATED RELIEF**

This matter having come before the court on (I) the motion (the "Original

Motion"; terms not otherwise defined in this Sale Order shall have the meanings ascribed to such

terms in the Original Motion) filed by Winstar Communications, Inc. and its affiliated debtors

and debtors in possession in the above-captioned cases (collectively, the "Debtors"), requesting

the entry of (A) an order pursuant to sections 363(b) and 105(a) of title 11, United States Code

(the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving bidding procedures, including bid

protections, (ii) approving the form and manner of notice of (a) the hearing to consider granting

certain bid protections (the "Bid Procedures Hearing"), (b) the hearing on the sale of certain of

the Debtors' assets (the "Sale Hearing"), (c) proposed cure payments and (d) assumption and

assignment of executory contracts and unexpired leases, and (iii) scheduling the Sale Hearing,

and (B) an order authorizing and approving (i) the sale of certain of the Debtors' assets free and clear of liens, claims and encumbrances (the "Sale") and (ii) the assumption and assignment of certain executory contracts and unexpired leases, and (II) the supplement to the Original Motion filed with the Bankruptcy Court on December 14, 2001 (the "Motion Supplement", and together with the Original Motion, the "Motion") seeking entry of an order (i) authorizing the Debtors to enter into, and approving, a management agreement substantially in the form annexed to the Motion Supplement as Exhibit A (the "Management Agreement"), (ii) approving, and authorizing the Debtors to implement, the Debtors' proposed regulatory transition process (the "Regulatory Transition Process") and (iii) granting related relief, including an extension of the period under Bankruptcy Code section 365(d)(4) within which the Debtors may decide whether to assume or reject unexpired leases of nonresidential real property; and the Court having conducted a hearing on November 27, 2001, and having entered an order dated November 27, 2001 approving the Bidding Procedures; and an auction having been held at the offices of Shearman & Sterling, counsel to the Debtors, on December 5, 2001, in accordance with the Bidding Procedures previously approved by this Court; and following the conclusion of the Auction, the Debtors, in consultation with their financial advisors, and after consultation with counsel to each of the Creditors' Committee, the Agent for the Prepetition Lenders and the Agent for the DIP Lenders, having (i) reviewed each bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale, and (ii) identified the bid of IDT Winstar Acquisition, Inc. (the "Buyer"), as set forth in the Asset Purchase Agreement, dated as of December 18, 2001 (the "Asset Purchase Agreement") as the highest and best offer for the Purchased Assets (as defined below in Paragraph H) at the Auction (the "Successful Bid"); and a hearing on the Motion

WP3:714361.3

58222.1001

having been commenced on December 10, 2001 and continued on December 17, 2001 and December 18, 2001 (the "Sale Hearing"); and all interested parties having been afforded an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered (i) the Motion, (ii) the objections thereto, if any, and (iii) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Motion and approval of the Sale of the assets to be acquired under the Asset Purchase Agreement (as defined therein, the "Purchased Assets") and the entry of an order approving the Sale (this "Sale Order") is in the best interests of the Debtors, their estates, creditors, and other parties in interest; and upon the record of the Sale Hearing, and these cases; and after due deliberation thereon; and good cause appearing therefor, it is hereby

FOUND AND DETERMINED AS FOLLOWS:[1]

A.    This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(M). Venue of these cases and the Motion is proper pursuant to 28 U.S.C. §§1408 and 1409.

B.    The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of 11 U.S.C. §§101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure.

C.    As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Cure Notices, the Sale of the Purchased

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. <u>See</u> Fed.R.Bank.P. 7052.

WP3:714361.3

58222.1001

Assets and of the related transactions contemplated thereby (including without limitation the entry of the Debtors into the Management Agreement and the implementation of the Regulatory Transition Process) has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure; (ii) such notice was reasonable, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Motion, the Sale Hearing, the Cure Notices, the Sale of the Purchased Assets and all the related transactions contemplated thereby (including without limitation the entry of the Debtors into the Management Agreement and the implementation of the Regulatory Transition Process) shall be required.

D.     A reasonable opportunity to object or be heard with respect to the Motion and the relief requested in the Motion has been afforded to all interested persons and entities, including (i) counsel for the Buyer, (ii) counsel for The Bank of New York, as Agent under the Pre-Petition Credit Agreement, (iii) counsel for Citibank, N.A., as agent under the DIP Credit Agreement, (iv) counsel for the Official Committee of Unsecured Creditors (the "Creditors' Committee"), (v) the Office of the United States Trustee, (vi) each party identified by the Debtors as a potential Buyer of the Purchased Assets that was contacted as part of the Sale process, (vii) all entities known to have any asserted lien, claim, encumbrance, alleged interest in or with respect to the Purchased Assets, (viii) all applicable federal, state and local taxing authorities; and (ix) all other entities that have filed requests for notices pursuant to Bankruptcy Rule 2002.

E.     The Debtors (i) have full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated by the Motion, (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the

Motion and the Asset Purchase Agreement and (iii) have taken all corporate action necessary to authorize and approve the Sale and the consummation by the Debtors of the transactions contemplated thereby.

F.    The Debtors have demonstrated sound business justifications for the Sale and the other transactions and actions contemplated by the Motion pursuant to section 363(b) of the Bankruptcy Code.

G.    Each of the Sale, the Management Agreement and the Asset Purchase Agreement were negotiated, proposed and agreed to by the Debtors and the Buyer as parties thereto without collusion, in good faith, and from arm's-length bargaining positions.  The Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such is entitled to all of the protections afforded thereby.

H.    The consideration provided by the Buyer for the Purchased Assets (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Purchased Assets and (iii) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.

I.    The transfer of the Purchased Assets to the Buyer under the Sale and the Asset Purchase Agreement will be a legal, valid, and effective transfer of such Purchased Assets, and will, upon the occurrence of the Closing (as defined in the Asset Purchase Agreement), vest in the Buyer all right, title and interest of the Debtors in the Purchased Assets free and clear of all Encumbrances and interests other than the Permitted Encumbrances (in each case, as defined in the Asset Purchase Agreement) (collectively, the "Interests") including, but not limited to, those (i) that purport to give to any party a right or option to give any of the foregoing in the future, any sale or contingent sale or title retention agreement or lease, or termination of the Debtors' or

5

the Buyer's interest in the Purchased Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the Closing Date (as defined in the Asset Purchase Agreement).

J.     The transfer of the Purchased Assets to the Buyer free and clear of all Interests will not result in any undue burden or prejudice to any holders of any Interests since all such Interests of any kind or nature whatsoever shall attach to the net proceeds of the Sale (the "Sale Proceeds") in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to the Carveout (as defined in the Final Order Authorizing Debtors In Possession to Enter Into Post-Petition Credit Agreement and Obtain Post-Petition Financing Pursuant to Section 363 and 364 of the Bankruptcy Code, and Providing Adequate Protection and Granting Liens, Security Interests and Superpriority Claims, dated May 14, 2001 and entered in these cases) and to any claims and defenses the Debtors or other parties may possess with respect thereto.

K.     The Buyer would not consummate the transactions contemplated by the Sale, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Purchased Assets to the Buyer was not free and clear of all Interests of any kind or nature whatsoever, or if the Buyer would, or in the future could, be liable for any such Interests and if the assignment of the Purchased Assets could not be made under section 363 of the Bankruptcy Code.

L.     The Debtors may sell the Purchased Assets free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  Those (i) holders of Interests and (ii) non-debtor parties who did not object, or who withdrew their objections, to the Sale, the Sale of the Purchased Assets or the Motion are deemed to have consented pursuant to Bankruptcy Code

WP3:714361.3                                                    58222.1001

section 363(f)(2). Those holders of Interests fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they claim or may claim an Interest. Notwithstanding anything contained herein or in the Asset Purchase Agreement to the contrary, the Sale of the Purchased Assets is subject to the consent of the DIP Lenders.

M.    Due to the regulated environment in which certain of the Purchased Assets are operated, the entry of this Sale Order is necessary to ensure the uninterrupted provision of services to customers of the Debtors (the "Customers") during the period in which the Buyer and the Debtors seek to comply with the applicable federal and state regulatory laws and to enter into contractual or other legal arrangements necessary for the consummation of the Sale, the transfer of the Licenses (as defined below) to the Buyer and the operation of the Purchased Assets by the Buyer (the "Compliance Items").

N.    Approval at this time of the Sale, the Asset Purchase Agreement and the Management Agreement, and all the transactions contemplated thereby and hereby (including the Regulatory Transition Process) is in the best interests of the Debtors, their creditors, their estate and other parties in interest.

NOW THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, EFFECTIVE IMMEDIATELY, THAT:

1.    The Motion is granted, as further described herein.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits, provided, however, that nothing herein shall alter or impair the rights of any party

7

that has filed and served a timely objection to dispute the amount of a cure payment listed on an applicable Cure Notice, which rights are specifically reserved and which disputes shall be resolved either consensually or, as necessary, by further order of the Court. Notwithstanding anything in the Motion, the Asset Purchase Agreement or this Sale Order to the contrary, the Debtors shall not be authorized to assume and assign any executory contract(s) between any of the Debtors and the United States General Services Administration (the "GSA") without the prior consent of a person authorized to act on behalf of the GSA to the extent such consent is required by any contract or applicable law.

3.    The Asset Purchase Agreement substantially in the form attached as Exhibit A to the Notice of Filing of Asset Purchase Agreement, dated December 18, 2001 (including all exhibits, schedules and annexes thereto), and all of the terms and conditions thereof, are hereby approved.

4.    Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to consummate the Sale of the Purchased Assets, pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, to enter into the Management Agreement and to implement the Regulatory Transition Process.

5.    The Debtors are authorized to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement (including the Management Agreement), and to take all further actions as may be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by

the Asset Purchase Agreement, including without limitation the implementation of the Regulatory Transition Process. Notwithstanding anything in the Motion, the Asset Purchase Agreement or this Sale Order to the contrary, the Buyer assumes no employee liabilities that arose prior to the Closing Date, including any accrued but unbilled liabilities.

6.      The transfer of the Purchased Assets to the Buyer pursuant to, and subject to the terms of, the Asset Purchase Agreement shall constitute a legal, valid and effective transfer of the Purchased Assets, and shall, upon the occurrence of the Closing, vest in the Buyer all right, title and interest of the Debtors in and to the Purchased Assets to be acquired by such Buyer free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the Sale Proceeds in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to the Carveout and to any claims and defenses the Debtors or other parties may possess with respect thereto.

7.      In consideration for the Purchased Assets, and subject to the terms and conditions of the Asset Purchase Agreement, the Buyer shall assume the Assumed Liabilities (as defined therein) and, on the Closing Date, shall irrevocably (i) pay, at the Debtors' election, exercised prior to the Closing Date, (x) an amount in cash equal to $38,000,000 (the "Cash Payment") or (y) an amount in cash equal to $30,000,000 and cause to be issued to the Debtors a number of shares of Class B common stock of IDT Corporation, having a value equal to $12,500,000 based on the average closing price of such stock during the seven trading day period ended December 14, 2001 (the "IDT Shares", and together with the $30,000,000, the "Cash/Stock Payment"), and (ii) issue to the Debtors such number of shares of common stock of the Buyer, representing 5% of the outstanding shares of Buyer Common Stock as of the date hereof, all in accordance with the terms and conditions of the Asset Purchase Agreement.

Pursuant to the Escrow Agreement (as defined in the Asset Purchase Agreement), which is hereby approved, on or before the date of this Sale Order, the Buyer shall deliver or shall have delivered the Cash Payment to the Escrow Agent (as defined in the Asset Purchase Agreement) to be held in escrow pending Closing. On the Closing Date, the Debtors and the Buyer shall instruct the Escrow Agent to promptly release the Escrow Amount (as defined in the Asset Purchase Agreement) to an account or accounts designated by the Debtors, on behalf of the Debtors in accordance with the terms of the Escrow Agreement. Such account shall be an interest-bearing account in the name of one or more of the Debtors established at Citibank, N.A. for the purpose of receiving such funds (the "Proceeds Account"). The Sale Proceeds shall be maintained in the Proceeds Account and shall not be distributed to any party in interest, including professionals and secured parties, pending further order of the Court following notice and a hearing. Accrued interest on such funds shall constitute part of the Sale Proceeds available for distribution. The Buyer shall have no claim whatsoever to or against any of the funds in the Proceeds Account or to the IDT Shares or the Buyer Common Stock subsequent to the Closing. Any allocation of the Purchase Price agreed to by the Debtors and the Buyer shall not be binding on any other party.

        8.      On the Closing Date, the Buyer and the Debtors shall enter into the Management Agreement, and the Buyer shall deposit into an account at Citibank, N.A. (the "Operating Account") an amount in cash equal to $60 million in immediately available funds, to be used from and after the Closing Date through and including the Cutoff Date (as defined in the Management Agreement) exclusively to pay all costs set forth in subsection 3.1(a) of the Management Agreement. In the event that the Buyer shall fail to pay, as and when due, any such costs and the Debtors shall be held liable therefore, the Buyer hereby agrees to indemnify the

Debtors for all such costs. In the event that any funds shall be on deposit in the Account (as defined in the Management Agreement) after the Cutoff Date, and all accrued and unpaid costs required to be paid in accordance with the Management Agreement shall have been paid, any balance may, upon five (5) days' written notice to the Debtors, the Agent for the Postpetition Lenders and such telecommunications service providers that shall send written request to the Buyer requesting such notice and the Buyer shall provide such notice to each party to the extent such party shall continue to provide services to the Debtors or the Buyer, be withdrawn by the Buyer.

      9.     Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order, effective upon the occurrence of the Closing, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and other regulatory authorities, lenders, trade and other creditors holding Interests (including but not limited to any claims under any applicable revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law) of any kind or nature whatsoever against or in the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date of the Sale of the Purchased Assets, or the transfer of such Purchased Assets to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its successors or assigns (to the extent allowed by law), its property, its officers, directors and shareholders or the Purchased Assets, such persons' or entities' Interests. Notwithstanding anything herein to the contrary, nothing

11

herein shall in any way affect or diminish any rights of the Debtors or any successor thereto (including any chapter 11 or chapter 7 trustee) with respect to obligations of the Buyer arising under the Asset Purchase Agreement, the Management Agreement or this Sale Order. This Sale Order shall be binding on the Debtors and the Debtors' estates, including, following any conversion of these cases, any successor chapter 7 estates, and any chapter 7 trustees appointed in these cases.

10.     The consideration provided by the Buyer for the Purchased Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

11.     Notwithstanding any provision to the contrary in this Sale Order, the Motion or the Asset Purchase Agreement, certain prototype laboratory equipment (as listed on Exhibit A hereto, the "Lab Equipment") and certain disbursement and investment accounts established in connection with the Lucent Credit Agreement (as listed on Exhibit B hereto, the "Accounts") shall be segregated from the Debtors' other assets, shall not constitute part of the Purchased Assets and shall not be included in the Sale. Nothing in this Sale Order, the Motion or the Asset Purchase Agreement shall impair or affect the rights and interests of Lucent in the Lab Equipment and the Accounts. The Buyer hereby reserves the right, subject to notice and a hearing, to seek to characterize the Lab Equipment as owned by the Debtors, and to the extent an Order so providing is entered by the court, the Lab Equipment shall constitute Purchased Assets.

12.     This Sale Order (a) shall be effective as a determination that, on the Closing Date, and subject to the occurrence of the Closing, all Interests of any kind or nature whatsoever existing prior to the Closing as to the Purchased Assets transferred pursuant to the

12

Asset Purchase Agreement (including but not limited to any claims under any applicable revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law) have been unconditionally released and terminated as to such Purchased Assets, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the act of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

13.     Each and every federal, state and local governmental agency, department or unit is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, except the FCC as regards its approval of the transfer of the Licenses.

14.     Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order in respect of the Asset Purchase Agreement or the Purchased Assets to be transferred pursuant to such Asset Purchase Agreement, the Buyer shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to such Purchased Assets and, to the extent allowed by law, the Buyer (and its officers, managers and members) shall not be liable for any other claims against the Debtors or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date under the Asset

13

Purchase Agreement, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, other than the Permitted Encumbrances, arising prior to the Closing Date under the Asset Purchase Agreement, including, but not limited to, any liabilities under any revenue, pension, ERISA, tax, labor, environmental or natural resource law, rule or regulation, or any products liability law, arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the Closing Date. After the Closing and the payment of the Purchase Price, the Buyer shall have no liability to the Debtors or their estates for any diminution in value or other damage of any kind whatsoever to the Regulated Assets or the Licenses that may result from the Buyer's operation of the Debtors' business.

15.    This Court retains and shall have exclusive jurisdiction to endorse and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith (including the Management Agreement) in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, and (d) interpret, implement, and enforce the provisions of the Asset Purchase Agreement and this Sale Order.

16.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of any Purchased Assets shall not affect the validity of the Sale of such Purchased Assets to the Buyer, unless such authorization is duly stayed pending such

WP3:714361.3                                    58222.1001

appeal prior to the Closing with respect to such Purchased Assets. The Buyer is a purchaser in good faith of the Purchased Assets, and the Buyer is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

17.    The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Buyer and their respective affiliates, successors and assigns and any affected third parties (including, but not limited to, all persons asserting Interests in the Purchased Assets to be sold to the Buyer pursuant to the Asset Purchase Agreement), notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

18.    The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety. To the extent that any provision of this Sale Order is inconsistent with the Asset Purchase Agreement or the Management Agreement, the terms of this Sale Order shall control.

19.    The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and is, if occurring prior to the Closing Date, approved by counsel for each of the Creditors' Committee, the agent for the lenders under the Pre-Petition Credit Agreement, and the agent for the lenders under the DIP Credit Agreement. The Debtors shall also notify counsel for Lucent of any

modification, amendment or supplement to the Asset Purchase Agreement and, if such modification, amendment or supplement impairs or adversely affects Lucent's rights as a secured creditor in these chapter 11 cases, shall obtain Lucent's prior consent thereto.

20.    The transfer of the Purchased Assets pursuant to the Asset Purchase Agreement, and the transactions contemplated thereby constitute steps toward the formulation, or in anticipation of the formulation of, a chapter 11 plan for the Debtors and as such, in accordance with section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer to effectuate the Asset Purchase Agreement and the transactions contemplated thereby shall not be taxed under any law imposing a stamp tax or a sale, transfer or any other similar tax, and the recordation of any instruments (including bills of sale, leases, assignments and amendments thereto) to evidence the Sale of the Purchased Assets shall not be subject to any such tax.

21.    All of the Debtors' interests in the Purchased Assets to be acquired by the Buyer under the Asset Purchase Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer.  Upon the occurrence of the Closing, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets acquired by the Buyer under the Asset Purchase Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets acquired by the Buyer under the Asset Purchase Agreement to the Buyer.

22.    As of the Closing Date, the Buyer shall be hereby granted immediate and unfettered access to the Purchased Assets (other than the Licenses) acquired by the Buyer.

<u>Regulatory Transition Process</u>

16

23.    The Debtors and the Buyer shall have a period (the "Regulatory Compliance Period") of one hundred-twenty (120) days (subject to extension) from the Closing Date to obtain the requisite federal and state regulatory approvals necessary to operate the Business and to enter into contractual or other legal arrangements necessary for the consummation of the Sale, transfer of the Licenses and the Regulated Assets (as defined below) to the Buyer and the operation of the Purchased Assets by the Buyer (the "Compliance Items"). In order to ensure the uninterrupted provision of services to the Customers during the Regulatory Compliance Period, and the orderly transfer of the Licenses and, to the extent required by any other applicable law, any other assets subject to similar transfer restrictions (the "Regulated Assets") to the Buyer, the Buyer, the Debtors and all providers of goods and services to the Debtors, including but not limited to the common carrier service providers that provide services to the Debtors and any landlords of properties used by the Debtors (the "Service Providers") are hereby authorized and directed as follows:

a.    As soon as practicable following the entry of this Sale Order, the Debtors and the Buyer are directed to file such applications as are required to seek the federal and state regulatory authority necessary for the Debtors to assign, and the Buyer to acquire, own and operate, the Licenses and the Regulated Assets.

b.    On the Closing Date, the Buyer and the Debtors are directed to enter into a Management Agreement substantially in the form appended as Exhibit E to the Asset Purchase Agreement, pursuant to which the Buyer shall be entitled to manage and operate the business of the Debtors during the Regulatory Compliance Period on the terms and conditions set forth therein.

c.    From the Closing Date to the Cutoff Date, all agreements and other arrangements with Service Providers relating to the Debtors providing service to Customers shall, subject to compliance with paragraph (d) below, remain in effect and

17

may not be canceled or terminated, and absent an event of default occurring after the

Closing Date in respect of facts arising after the Closing Date that has not been cured

within three (3) business days after written notice (by email and facsimile) thereof has

been received by the Buyer (Attention: Chief Financial Officer, email:

steveb@corp.idt.net, facsimile: 973-438-1414, and McDermott, Will & Emery,

Attention: David C. Albalah, Esq., email: dalbalah@mwe.com, facsimile: 212-574-5444),

no Service Provider shall reduce or otherwise alter in any adverse manner its

performance under any such agreement(s) or arrangement(s) until the Cutoff Date.

      d.      The Buyer shall be responsible for, and is directed to pay on a timely

basis, all charges incurred for services used by the Debtors to provide services to the

Customers from the Closing Date to the Cutoff Date, including all charges incurred with

respect to Service Providers. The rates charged by Service Providers for such services

shall not exceed the rates for those services in effect as of the date of this Sale Order.

Neither the Debtors or Buyer shall have any obligation or liability for services not

actually being utilized and each Service Provider shall, upon written notice from the

Debtors and the Buyer, immediately and without charge or further liability of any kind

discontinue and disconnect any such services provided to the Debtors and/or the Buyer.

      e.      The Buyer is further authorized to promptly establish such contractual or

other legal arrangements as the Buyer and the Debtors deem necessary to operate the

Debtors' assets and to provide service to Customers (including interconnection and other

common carrier service agreements with Service Providers) and that will permit Buyer to

provide service to Customers in a manner similar to the manner in which the Debtors

provided such service prior to the date of this Sale Order and that will enable the

Customers to continue to receive service in an uninterrupted and transparent manner.

      f.      During the 120-day period commencing on the Closing Date, in the event

that any contract with any Service Provider that is a telecommunications carrier shall be

rejected: (i) no termination liabilities shall arise; (ii) such telecommunications carrier

18

shall provide telecommunications services in accordance with, and to the extent required by, applicable law in a non-discriminatory manner; and (iii) such telecommunications carrier will charge the Buyer for replacement circuits the lower of actual costs and tariff rates to set up or establish such replacement circuits.

24.    The Buyer is hereby directed to pay all costs of the ongoing operations of the Business in accordance with the Management Agreement.  The Buyer shall have the ability during the Regulatory Compliance Period to direct the Debtors to seek the entry of one or more orders of the Court authorizing the Debtors to assume and assign to the Buyer any executory contract or unexpired lease to which the Debtors are a party, provided that the Buyer shall be solely responsible for paying any cure payment that is payable in connection with any such assumption and assignment.  The Buyer shall have the ability during the Regulatory Compliance Period to direct the Debtors to reject any executory contract or unexpired lease to which the Debtors are a party provided that the Buyer must elect whether to assume and assign or reject any contracts with the GSA and must provide written notice of such election to the GSA on or before January 2, 2002.  The Debtors may effect any such rejection by delivery of two (2) business days prior written notice (and the irrevocable waiver of the right to withdraw such notice) to the non-Debtor party to any such executory contract or unexpired lease of the Debtors' unequivocal intent to reject such executory contract or unexpired lease.  In the event that the Buyer elects to reject any contract on account of which a prepayment has been made pursuant to Section 3.1(a) of the Management Agreement, the counterparty to such contract shall be obligated to refund promptly to the Buyer (without setoff or counterclaim) the unused portion of such prepayment and in the event of any dispute with respect thereto, the Buyer reserves the right to seek adjudication in the Bankruptcy Court.  In the event that the Buyer elects rejection of

19

some or all of Debtors' contracts with the GSA, the Buyer agrees that it will continue to provide telecommunications services to GSA until GSA has received sixty (60) days' notice of discontinuance, or such longer period as the FCC requires. In all other respects, the Buyer shall manage the operations of the Business and shall be responsible for such operation pursuant to the terms and subject to the conditions of the Asset Purchase Agreement and the Management Agreement. The period within which the Debtors may elect to assume or reject unexpired leases of nonresidential real property under Bankruptcy Code section 365(d)(4) is hereby extended through the duration of the Term.

25.    Upon receipt of the required regulatory approvals and establishment of the necessary service agreements and arrangements, the Debtors are authorized to convey the Licenses and the Regulated Assets to the Buyer, in accordance with the terms and conditions of the Asset Purchase Agreement and the Management Agreement.

26.    As provided by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, the effectiveness of this Sale Order shall not be stayed for 10 days after entry on the docket and shall be effective and enforceable immediately upon such entry. The Buyer and the Debtors shall consummate the Sale as promptly as is practicable following Court approval of this Sale Order, so long as no stay of this Sale Order has been entered and is continuing.

Dated: Wilmington, Delaware
      December 19, 2001

                                                            _____
HONORABLE JOSEPH J. FARNAN, JR.
UNITED STATES DISTRICT JUDGE

20

WP3:714361.3

58222.1001

## EXHIBIT A

### Description of Lab Equipment

The following equipment currently is located at the Winstar lab facility, 2545 Horse Pen Road, Herdon, Virginia (the "Winstar Lab").

1.    Metropolis "evaluation" configuration description --

    a.    Metropolis 4500 System consisting of 1 Large Service Shelf, a High Speed optical Shelf and associated circuit packs;

    b.    Metropolis 2500 system consisting of a Large Service Shelf and associated circuit packs;

    c.    Metropolis 2000 system consisting of a Service Shelf and associated circuit packs.

The systems are installed in two seven foot equipment racks in the Winstar Lab.

2.    AnyMedia "evaluation" configuration description --

    a.    AnyMedia Access Unit consisting of common circuit packs & associated interface circuit packs;

    b.    Breakdown for AnyMedia:

        FAC 100 S1:1 SL1EJDCAA
        FAC 100 S1:1 SLC1EJDCAA
        COM100 S2:2 SLC1CGLCAA
        COM100 S2:3 SLC1CGLCA8
        DTP100 S1:1 SLC1DH0CAA
        DTP101 S1:2 SLC1DHKCAB
        LPA380 S3:3 E51SFBAAAA
        LPA300 S1:1 SLCUVR0BAA
        LPA380 S3:3 E51SFBAAAA
        LPU 116 S2:3 SN980CD953522L 107743536002 ESPQAYKAA
        Two tip ring cables - new
        Two T-1 Cables pieced together from parts
        Power cables

The trial configuration is a shelf mounted within a single seven foot equipment rack.

## EXHIBIT B

### Description of Accounts

| Account | Account Number |
|---|---|
| Fleet Bank Investment Account | 9427772529 |
| Fleet Bank Investment Account | 9428385707 |
| State Street Investment Account | 3274457 |
| State Street Investment Account | 3324773 |
| Fleet Bank Disbursement Account | 9427772510 |
| Fleet Bank Disbursement Account | 9428385694 |