EXHIBIT 9
PART 1 OF 2

1

1      IN THE UNITED STATES BANKRUPTCY COURT

2      IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4    In re                    :     Case No.
                               :
5    WINSTAR COMMUNICATIONS,    :
     INC., et al.,             :
6                              :
                               :
7          Debtors.           :   ⟨ No. 01-1430 (JJF)

8

9                        -/- -

10                   Wilmington, Delaware
                   Monday, December 17, 2001
11                      3:05 p.m.

12

13                        - - -

14

     BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.
15

16                        - - -

17

18

19

20

21

22

23

24

25

1850

1              (The following took place in chambers, Ms.

2    Morgan, Mr. Shapiro, Mr. Cobb, Mr. Karotkin, and Mr. Kenney

3    being present.)

4              THE COURT:  There is a hearing today scheduled

5    for a sale motion, and that was the only item that I had put

6    on the agenda.  As I understand it, there is no sale.  I have

7    asked counsel to come in and speak to me about the status of

8    this Chapter 11 and whether or not there still is no sale.

9    If counsel could put their appearances for the court reporter

10   on the record.

11             MR. SHAPIRO:  Mark Shapiro from Shearman &

12   Sterling for the debtors.

13             MS. MORGAN:  Pauline Morgan from Young Conaway

14   for the debtors.

15             MR. COBB:  Richard Cobb of Klett Rooney on behalf

16   of the debtor-in-possession lenders.

17             MR. KAROTKIN:  Steven Karotkin, Weil, Gotshal &

18   Manges, for the debtor-in-position lenders.

19             MR. KENNEY:  Mark Kenney for the United States

20   Trustee.

21             THE COURT:  Is it still correct that we have no

22   sale to rule upon?

23             MR. SHAPIRO:  Yes.

24             THE COURT:  I don't know how this fellow got in

25   chambers, but his name is Howard Jonas.

3

1              MR. KAROTKIN:  Can I respond to that, Howard

2    Jonas?

3              THE COURT:  Let me just put it on the record.  He

4    is from IDT Corporation, Newark, New Jersey, who presented a

5    card to my secretary saying he is a bidder.

6              Your turn.

7              MR. KAROTKIN:  IDT has kind of floated in and out

8    of this over the last three or four weeks with various

9    proposals, submitting proposals, withdrawing proposals.  As I

10   understand it, they submitted a proposal on Friday or

11   Saturday --

12             MR. SHAPIRO:  Friday afternoon.

13             MR. KAROTKIN:  -- pursuant to which they made an

14   offer to purchase some of the assets out of a Chapter 7.  The

15   people from Blackstone have been trying to understand what

16   they are proposing and exactly what they mean.  And right

17   before we came in here now, there were some discussions going

18   on with them to try to figure out whether a potential

19   transaction was possible.  I was involved in those

20   discussions.  I think that probably within ten or 15 minutes

21   there would be some more definiteness to whether or not that

22   was a potential.  But I don't want to overstate anything.

23             THE COURT:  All right.  I am going to take the

24   view presently -- of course, it could change, because I

25   assume they are still talking out there -- that there is a

1   motion for a sale but no sale pending for me to rule on.  So

2   the question is, scheduling going forward, what do I need to

3   schedule to move this case, either what was discussed at the

4   hearing that we continued to today, the possible conversion

5   to a Chapter 7, and what Court time would you need if that

6   was the application, or some other application.

7          MR. SHAPIRO:  I think where we are right now is

8   the bidder, the one bidder who was left said that they had

9   the money.  But of course we haven't seen it yet.  And of

10  course, as recently --

11         THE COURT:  I am beyond that.  I am saying there

12  is no sale.

13         MR. SHAPIRO:  Assuming there is no sale, I think

14  we have no choice but to convert the case.  We were there

15  last week and I think that's where we are now.  I think what

16  we have been talking to Mr. Kenney about is we tried to do

17  this, because it is a regulated company, in the absolutely

18  least disruptive way to everybody involved.  That is my goal,

19  to do something that will not harm people.  So I think it is

20  our view -- we have talked to the U.S. Trustee's Office about

21  it -- that we try to put into place a Chapter 7 trustee, have

22  a very, very shortened order for a hearing, a 341 meeting,

23  and put into place a permanent trustee very quickly so that

24  this whole 30-day migration program can be effectuated

25  quickly and in a way that is consistent with what the FCC is

1  interested in having and in a way that is consistent with

2  what the banks have been having.

3         I think he is amenable to that general concept.

4         MR. KENNEY:  Right.  I think what I get within

5  that concept, Your Honor, is because this is a regulated

6  company and because there are some significant governmental

7  interests involved here, we would want to make sure that the

8  order converting the case not only authorizes but directs the

9  trustee to operate the company to whatever extent is

10  necessary to avoid these disruptions.  I am not sure if we

11  can avoid all of the disruptions to all customers, but

12  certainly the federal and state agencies that are involved.

13         I had an inquiry from the district executive for

14  the Southern District of New York, who said their entire

15  system is on Winstar, and Verizon right now is not a viable

16  alternative for them because Verizon is still trying to

17  restore service to people after September 11.

18         MS. BAER (Court's Secretary):  There were

19  representatives from the Zimmerman Group that just knocked on

20  the door to let you know that they are here and that they

21  have an offer.

22         THE COURT:  So what I am hearing is that you

23  probably need to do some strategizing and paperwork, limited

24  paperwork, and, we had an omnibus hearing scheduled in this

25  case for --

1          MS. MORGAN:  The 20th.

2          MR. COBB:  Thursday.

3          THE COURT:  What time was it?

4          MS. MORGAN:  3:30, I think.

5          THE COURT:  Would you want to use that date or

6   have me give you a date next week, where you could come back

7   with whatever you didn't get in interim relief today?

8          MR. SHAPIRO:  One of the questions is whether we

9   can do it more quickly.  I think everyone is very concerned

10  that if we keep going we could --

11         THE COURT:  Quicker than the 20th, sure.  I want

12  to be available to help you get through this.

13         MR. SHAPIRO:  Our thought was to try to construct

14  an order that is consistent with what we just talked about,

15  that is consistent with ultimately making sure that the

16  system stays up for 30 days.  The banks and the carriers have

17  not yet reached agreement on how that will work.  The banks

18  are agreeing to allow some use of cash collateral to keep

19  this going.  The carriers want to be paid in full.  And you

20  have a negotiation that is currently ongoing between how much

21  they should get and how much the banks are willing to let

22  them have.  That hasn't been concluded.  I think if we can

23  have some out date by which everyone has got to reach an

24  agreement, put pressure on everyone to reach a deal, that

25  will be very helpful to us, if we could say we are converting

1   the case, and subject to working out an acceptable order in

2   the next 24 hours, and we will come back to Your Honor with

3   an order, hopefully that is consensual, with the U.S.

4   Trustee, the banks, and the FCC.

5           THE COURT:  So let's assume that I say 24 hours,

6   would you want me to schedule a hearing, if it is not

7   consensual, for tomorrow afternoon?

8           MR. SHAPIRO:  Yes, I think that would make sense,

9   if you had the time.

10          MR. KAROTKIN:  I think that is fine.

11          THE COURT:  A hearing on an intended motion to

12  convert.

13          MR. KAROTKIN:  I think that is fine.  I think we

14  had made progress with the FCC, and I am hopeful -- with the

15  FCC and with the carriers, and I am hopeful we can reach an

16  understanding.  I think to the extent that everyone has some

17  certainty, knowing there are no certainties in the world,

18  that the 30-day period is a 30-day period because there is a

19  limited amount of money here and everyone has to work really

20  hard to make sure it works, that is fine.  I would only ask

21  if we could impose upon the Court to participate by

22  telephone, it would make our lives really easy.

23          THE COURT:  We could actually do the whole thing

24  on telephone if someone initiates the call and you all line

25  up who you want on it, and we will do it by telephone.

1    MR. SHAPIRO:  We can set up a call-in number.

2    THE COURT:  Sure.

3    MR. SHAPIRO:  The other issue that we have is we

4  also have a bunch of -- your TRO that you issued on last

5  Monday will run out today.  I don't know if you want to

6  extend that, because we need 24 more hours to work this out.

7  Hopefully, no one will terminate us, but it makes sense to

8  extend it to the telephonic hearing.

9    THE COURT:  I will just enter an order that

10  continues it until tomorrow to whatever time we set the

11  hearing for.  Now, there will be some folks that won't

12  appreciate that, but probably nobody that is integral to what

13  you are trying to work out.  They will be involved in trying

14  to work it out.

15    MR. KAROTKIN:  I think that's right.  I think

16  most of the people we were on the phone with today.

17    MR. SHAPIRO:  We spent the weekend trying to work

18  this out.  It is not quite done, but I think, as Steve

19  characterized it, it's close.

20    MR. KAROTKIN:  If anything materializes with

21  these IDT people, are you available this afternoon?

22    THE COURT:  Yes.

23    MR. KAROTKIN:  I think people would like to stay

24  here to see if something could be worked out and if possible

25  come back before Your Honor.

1              MR. KENNEY:  Is Zimmerman one of the people who

2    was bidding?

3              MR. KAROTKIN:  He was here last week.

4              MR. KENNEY:  He never came up with anything.

5              MR. SHAPIRO:  He says he is here with his money.

6              THE COURT:  If you want to do the phone

7    conference at 2:00 tomorrow, we will enter an order extending

8    the TRO that was entered last Monday, and then we will take

9    off the hearing on the 20th, and then I will be here if

10   something develops with a potential buyer.

11             MR. KAROTKIN:  Great.  Thank you.

12             MR. KENNEY:  Your Honor, I have another

13   engagement that probably will not be over by 2:00.  If I

14   don't have all of my issues resolved with the debtors, I will

15   arrange for somebody from my office.

16             THE COURT:  We can move it.  When will you be

17   available.  3?

18             MR. KENNEY:  3 would work better.

19             THE COURT:  We will make it 3 tomorrow.

20             MR. SHAPIRO:  Just so Your Honor knows, we did

21   spend, to update you beyond my letter, we did spend all day

22   Friday with the Zimmerman folks trying to work out the

23   contract because we still hadn't finished with them on the

24   contract.  We weren't able to resolve -- there were about

25   half a dozen pretty significant issues that still could not

1    be agreed to between the debtors, the DIP lenders, and the

2    potential buyer.  And we said, look, you know, we are not

3    going to spend the whole weekend negotiating with you guys

4    when you are not telling us there is money.

5              I asked on Friday, can you provide me with at

6    least evidence that the money will be there on Monday.  Give

7    me something that tells me that we should continue this,

8    because this is becoming ridiculous and we have 25 people

9    working away on this in different places.  The best he could

10   tell me was that they were working with three bridge lenders

11   on a term sheet.  He didn't want to give it to me.

12             Frankly, a term sheet from a bridge lender for

13   the 15 million dollars wasn't particularly useful.  That is

14   where we ended up on Friday afternoon.  Over the weekend, I

15   called Susheel Kirpalani, their counsel at Milbank, a number

16   of times.  I exchanged a couple of voice mails.  And he had

17   nothing to report to me over the weekend in terms of ability

18   of his client to raise the funds.  The last I heard, they may

19   have been trying to get moneys wired from some third party

20   into a Wintel, which is the buyer's name, account somewhere,

21   and that in turn, Wintel, once it receives those funds from

22   wherever they are coming, would wire those funds to

23   Shearman & Sterling.

24             I asked them, when would that happen.  They

25   couldn't answer that.  I said, what about the rest of the

1    money?  15 is just a deposit, and you need a lot more money

2    to operate this company and close the deal.  And he had no

3    response.

4            THE COURT:  The kind of buyer you are looking for

5    may have a problem, I would think, may have some problem with

6    terms, but wouldn't be shallow on that 15 million.

7            MR. KAROTKIN:  The concern that we have is that

8    you have someone who has consistently said they are going to

9    put up money.  And let's say they do come up with some money

10   and you enter into a transaction which can't close for

11   another 30 days, where they are going to need more money, and

12   another 90 days where they are going to need more money, the

13   risk that doesn't show up, we are in a much worse situation

14   than we are in today.  That is a big concern of ours, and

15   ought to be of the FCC as well.

16           THE COURT:  Again, the kind of buyer that you are

17   looking for and need, that third-level money may not be tied

18   down, but the first and part of the second level would not be

19   a problem for them.  And it sounds like what they are doing

20   is hustling your conversation to try and get somebody to put

21   up some money.  The conversation isn't being seen by the

22   people that they are trying to get the money from as

23   something they want to invest in.

24           People with money, they drive deals.  If they are

25   not buying the hype -- you all see that every day.  There is

1  probably someone out there that had the money that they were

2  talking to but they are just not liking what they have to do

3  to make this deal.

4          MR. SHAPIRO:  This is the only one that actually

5  got a DIP.  The reason it did is everyone believed it could

6  be reorganized or sold.

7          THE COURT:  That was the big thing they were

8  talking about in the Journal.

9          MR. KAROTKIN:  The first and last DIP.

10          MR. KENNEY:  Maybe the Journal writer knows where

11  the money is.

12          THE COURT:  Actually, the numbers aren't that bad

13  for what you would get if you knew how to operate it.  If you

14  had some foresight that you could actually make it work, this

15  is like salvage.  It's not that bad.  But I guess, who is out

16  there to operate it?  The first round couldn't do it.  There

17  won't be many lenders coming in on these.

18          MR. KAROTKIN:  There aren't many DIPS that don't

19  get paid.  First of all, there are not many DIPS that don't

20  get paid in full and hardly any that are going to get 20

21  cents on the dollar or whatever, maybe 30 cents.

22          THE COURT:  DIPs don't lose money.  But there is

23  risk.

24          MR. KAROTKIN:  We know that now.

25          MR. KENNEY:  This is the case that proves the

1    rule.

2            THE COURT:  This proves the rule.  The worst part

3    of this case, you took forced financing for a week, too,

4    which will make DIPS wonder.

5            Well, okay.  I will be around if something

6    breaks.  I think you could tell those folks I will be real

7    focused on dollars today, and I think the three or four

8    levels they need dollars, not just today.  And absent that,

9    all those other folks out there, their problems are going to

10   be dealt with by a trustee.  There is nothing I can tell

11   them.  Mr. Kenney is going to work to get us something here.

12           MR. KENNEY:  We will try to get a trustee in real

13   quick.  One of the things Mr. Shapiro points out was the need

14   to, we will have a trustee with the authority and directive

15   to operate the company, but the reality is the learning curve

16   is going to be very steep.  And I think it's a given at this

17   point that at the 341 meeting the creditors will elect their

18   own trustee to replace the interim trustee.  So I think what

19   they want to do is accelerate the process.  And we had some

20   discussion about that, Rule 2002 says it is a 20-day notice

21   and it kind of falls into a twilight zone of whether the

22   Court can shorten that period.  I am going to let them do the

23   selling job on that and not take a position.

24           MS. MORGAN:  Your Honor, I don't think it is a

25   twilight zone.  I think 9006 says reduction is permitted in

1  certain circumstances.  It cites the rules under which

2  reduction is not permitted.  And the scheduling of a 20-day

3  notice of a 341 is not listed there.  That means reduction is

4  permitted.  I think we would ask the Court for a motion to

5  shorten that period so that that 341 meeting could be held in

6  about a week's time.  We would publish it on our website.  We

7  haven't thought about how else we could publish it.

8            MR. SHAPIRO:  Put out a press release.

9            MS. MORGAN:  Yes, to give people notice so they

10 could elect a trustee promptly.

11           MR. KENNEY:  We would ask for those kind of

12 safeguards.

13           THE COURT:  Those safeguards and take no

14 position -- right, which will work.

15           MR. SHAPIRO:  We can build that all into the

16 order.

17           MS. MORGAN:  If I may clarify.  There are a

18 couple agreements that we have in place, for instance,

19 assumptions and assignments with consent, there is one that I

20 have here with me today that would result in, for instance, a

21 waiver of a large administrative claim.  To the extent we can

22 get those approved, can we just submit those if they are

23 consensual?

24           THE COURT:  Anything that is consensual, just

25 send over, we will get them signed and stop the clock, or

1  avoid a claim, if we can.  If they are consensual, no one

2  cares.

3           MS. MORGAN:  As far as the motion to convert, is

4  the U.S. Trustee's motion --

5           MR. KENNEY:  We will move orally.

6           MS. MORGAN:  And we will file the motion to

7  shorten then.

8           MR. SHAPIRO:  We will prepare a consensual order.

9           MR. KAROTKIN:  I just have one question.  I

10  assume when we go outside Mr. Zimmerman is going to say, you

11  know, I have a bid to make, I want to make a bid --

12           THE COURT:  This isn't an option, that's what you

13  tell him.

14           MR. KAROTKIN:  I assume at this point a

15  determination of whether to consider these things rests with

16  the debtor and the creditors.

17           THE COURT:  The Judge doesn't get involved in

18  deciding whether he is -- doesn't take bids and doesn't

19  decide whether, you know, they are of some value to the

20  estate.

21           He has to sell the debtor.  But the motion that

22  was pending is now denied as moot.

23           Now, the debtor can get to reopen that motion,

24  what do they call it, reconsider, I mean that ruling, that it

25  is denied as moot, but he has to, I assume the debtor would

1   have to be convinced that there was some reason to move

2   that.   Somebody out there in the world who wanted to be in

3   the game can't come in and do that.

4                Does anybody disagree with that?

5                MR. KAROTKIN:  No.

6                MR. SHAPIRO:  No.

7                THE COURT:  I told Ms. Morgan when I was worried

8   about scheduling or concerned about scheduling that unless

9   there was some premise to the sale motion, that the hearing

10  was canceled, because that's what I had before me, a sale

11  motion.   And that's what I did.

12               Now I am going to deny the motion on the record

13  as moot, and you can move for me to reconsider that ruling on

14  some basis.   But there is nothing there now.   He should be

15  talking to the debtor and to you.

16               MR. KAROTKIN:  Okay.  Thank you.

17               THE COURT:  Our friend from the Trustee's Office,

18  whose motion to convert is just hours away from being

19  considered and ruled on.

20               MR. SHAPIRO:  The TRO --

21               THE COURT:  I will do that on my own, based on

22  the conversation we had here that you need time -- why I got

23  you in here was scheduling and what was going to, you know,

24  be your idea about going forward.   And based on what you told

25  me, I will extend that for 24 hours, to our 3:00 hearing

1  tomorrow, with the understanding, as I hope I said before,

2  that all the parties subject to that restraining order are

3  working with you to reach something consensual so they are

4  not being in any way unduly prejudiced.  If they can't agree

5  with you, we will hear them tomorrow at 3:00.  But that's

6  unlikely.  I would hope it's unlikely.  Hopefully, they are

7  going to work to make this a smooth landing -- there is no

8  smooth landing here -- but so that no one has to suffer a

9  fatality, is the hope.

10              MR. KAROTKIN:  Can we go off the record a

11  minute?

12              THE COURT:  Sure.

13              (Discussion off the record.)

14              MS. MORGAN:  I guess those people want to hear

15  what is happening and we are telling them what is happening.

16              THE COURT:  It is over.  There is no sale.  There

17  is nothing to do.  Right?

18              (Conference in chambers adjourned.)

19              (The following took place in open court, at

20  approximately 5:50 p.m.).

21              THE COURT:  Proceed, please.

22              MR. SHAPIRO:  Good afternoon, Your Honor.  Mark

23  Shapiro from Shearman & Sterling for Winstar Communications,

24  debtors.

25              Your Honor, after our chambers conference earlier

1    this afternoon, during that chambers conference, a party

2    named IDT Corporation, who had been a party that the debtors

3    had been having on-and-off discussions with through the

4    entire auction process but whom debtors could not reach

5    agreement with, made an offer to the financial advisors to

6    the debtor, Blackstone.  Since that time we have worked to

7    try to flesh out all the terms of that offer.

8             I think we have what I will call the principle

9    points agreed to in principle but not in writing.  And what

10   we would like to do is have the attorney for IDT Corporation

11   present those to the Court so that the Court understands

12   their offer.  We would work this evening to try to finish a

13   contract with them and come back at 3:00 tomorrow to see

14   whether in fact we have a deal, and if we don't have a deal

15   or it is not an agreed upon deal that we have a meeting of

16   the minds on, then we would go back to the plan we discussed

17   with Your Honor in chambers earlier today.

18             We believe that this deal, if we could consummate

19   this deal, would be beneficial to the estate, would

20   potentially be beneficial to some of the employees, and would

21   allow, certainly allow an orderly transition period for

22   customers.

23             With that, I would like to have David Albalah,

24   counsel for IDT, present to the Court the details of their

25   offer.  We will supplement that to the extent it differs from

1    our understanding.  And then what I would propose we do is

2    adjourn to the offices of Young Conaway to see whether we can

3    work out between now and 3:00 p.m. a contract and management

4    agreement and order that we would present tomorrow at 3:00

5    p.m. in court.

6                    THE COURT:  All right.

7                    MR. HARRINGTON:  Good afternoon, Your Honor.

8    William Harrington, Duane Morris & Heckscher.  I would like

9    to move the admission of David Albalah.  His pro hac motion

10   was previously filed with the Court electronically but has

11   not been signed yet.

12                   THE COURT:  I will grant the application.

13                   MR. ALBALAH:  Thank you, Your Honor.  Good

14   afternoon, Your Honor.  Thank you for your patience.  David

15   Albalah from McDermott, Will & Emery on behalf of IDT

16   Corporation.

17                   As counsel for the debtor just communicated, we

18   have spent a fair amount of time today, and I do believe we

19   have an agreement in principle.  What I will do is go through

20   the salient points.  At the conclusion thereof, I will ask

21   Your Honor to so order the record.

22                   The transaction is as follows --

23                   THE COURT:  Let me understand something.  When

24   you suggested I would so order the record, my understanding

25   is that, and because of the history here, that I would listen

1   to this proposed offer, and then, because it would be

2   something that no one had notice of, we would have the record

3   on this offer closed, come back tomorrow at the hearing we

4   thought we were going to have today, and it would be in

5   court.  We were going to have a telephonic hearing about a

6   conversion.  But we would come back tomorrow, and then I

7   would listen to anybody that wanted to be heard on this

8   proposed transaction, and then at that point I would consider

9   approving this transaction.   Otherwise, nobody else had

10   notice of what you are going to tell me, and I am hearing it

11   for the first time.

12            Mr. Shapiro, is that what you were thinking?

13            MR. SHAPIRO:  Yes.  I am not sure what Mr.

14   Albalah meant by being so ordered.  I think this is just an

15   explanation to the Court of what is to come for tomorrow.

16   Tomorrow's hearing would be a presentation of the contract

17   and the order.  Yes, I agree with Your Honor's remarks.

18            MR. ALBALAH:  Part of the concern, Your Honor --

19   I don't want to dwell on it now, I think we should go through

20   the points and circle back to this.  Part of the concern, and

21   I want to consult with my client, is whether the debtor is

22   shopping this thing.  We haven't discussed the breakup fee or

23   anything along those lines.  So we expect this to be the

24   deal.  We will circle back with Your Honor, with Your Honor's

25   permission, to get comfort in that regard.

1          The transaction would be as follows.

2          IDT Corporation or its designee would purchase

3   all of the assets, free and clear of all liens, claims,

4   interests, and encumbrances, except for specifically

5   delineated assets.  And I will tell you what they are.  The

6   purchase price will be 38 million dollars cash or 30 million

7   dollars cash plus Class B IDT common stock in the value of

8   12.5 million, measured based upon the last seven trading days

9   from today.

10         If IDT does not get a registration within 60

11  days, then the debtor would be able to put that stock

12  interest on IDT for ten million dollars cash.  So either it's

13  38 million dollars cash, or 30 million dollars cash plus 12.5

14  million dollars in stock, or 40 million dollars cash.

15         MR. JONAS:  I think that is the choice.

16         MR. ALBALAH:  The debtor will elect as to whether

17  it wants the cash option or the cash and stock option.  It is

18  at the debtors' election.  All or nothing.

19         The excluded assets are Lucent litigation,

20  Office.com, Aon Put, Wamnet (phonetic) Debt & Equity,

21  RadioNote, TVVideo Note, avoidance actions, D&O claims, any

22  prepaid workers' compensation, tax refunds, if any, cash as

23  distinguished from accounts receivables, claims against

24  Savis, I believe that's S-a-v-i-s, claims against Velocita,

25  V-e-l-o-c-i-t-a, PSINet Hong Kong, excluded subs, that's

1          The transaction would be as follows.

2          IDT Corporation or its designee would purchase

3   all of the assets, free and clear of all liens, claims,

4   interests, and encumbrances, except for specifically

5   delineated assets.  And I will tell you what they are.  The

6   purchase price will be 38 million dollars cash or 30 million

7   dollars cash plus Class B IDT common stock in the value of

8   12.5 million, measured based upon the last seven trading days

9   from today.

10          If IDT does not get a registration within 60

11  days, then the debtor would be able to put that stock

12  interest on IDT for ten million dollars cash.  So either it's

13  38 million dollars cash, or 30 million dollars cash plus 12.5

14  million dollars in stock, or 40 million dollars cash.

15          MR. JONAS:  I think that is the choice.

16          MR. ALBALAH:  The debtor will elect as to whether

17  it wants the cash option or the cash and stock option.  It is

18  at the debtors' election.  All or nothing.

19          The excluded assets are Lucent litigation,

20  Office.com, Aon Put, Wamnet (phonetic) Debt & Equity,

21  RadioNote, TVVideo Note, avoidance actions, D&O claims, any

22  prepaid workers' compensation, tax refunds, if any, cash as

23  distinguished from accounts receivables, claims against

24  Savis, I believe that's S-a-v-i-s, claims against Velocita,

25  V-e-l-o-c-i-t-a, PSINet Hong Kong, excluded subs, that's

1   it -- the above net claims, correct.

2          Those are the excluded assets.  Everything else

3   is to be purchased, and again free and clear of all liens,

4   claims, interests and encumbrances.  And we will have an

5   order obviously that I will comment on.

6          The debtor -- I am going through this in no

7   particular order.

8          The debtor intended to notice termination to

9   customers.  The debtor will not do that.  My client will have

10  the right to determine the timing of the sending of that

11  notice.  My client will be obligated to fund costs going

12  forward for the transition period pending regulatory, FCC and

13  state regulatory approvals.

14         The only exception to the concept of my client

15  controlling when the notice is circulated, if at all, is to

16  the extent that there is any Hart-Scott requirement.  If

17  there is a Hart-Scott requirement, and we determine that

18  there is a Hart-Scott requirement, then the notices will go

19  out Thursday.

20         There would be in the order, and in appropriate

21  other documents, clarity with respect to no employee

22  liability whatsoever.  My client, in addition to the general

23  free and clear, assumes no liabilities with respect to

24  employees of any kind or nature.

25         There is no out for regulatory consents.  If the

1    FCC, if the state regulatory authorities, do not consent to

2    the transaction for any reason, there is no out.

3              To the extent that the licenses have any value

4    and proceeds are realized, that would be part of the assets

5    purchased.

6              The parties contemplate that this Court would

7    issue an order similar to the order that I understand is in

8    effect, compelling service providers of all nature and kind,

9    including telecom companies, landlords, et cetera, to

10   continue providing services during the transition period.

11   But my client will pay all those services.  My client may

12   negotiate discounts, may negotiate terms, but there is a

13   guarantee for the payment of that money.

14             In addition to the purchase price, there is a

15   five-percent interest that the estate would get in an entity

16   to be formed by my client.  That five percent the estate

17   would share, as, when, and if my client gets back its

18   investment in an unknown amount at this point in time.  We

19   know what we are making in terms of, in other words, cash and

20   stock.  We can quantify that.  We can't quantify the costs

21   that my client will pay to keep this alive.  As, when, and if

22   all of those costs come back, then the estate will have a

23   five-percent interest in the upside.

24             It is my understanding that the contemplation is

25   that the case may convert from 11 to 7.  We would have

1  assurances that this agreement is binding upon the Chapter 7

2  trustee and the estate.

3          It's an as is, where is acquisition, with no reps

4  and warranties.

5          My client has not yet determined the extent to

6  which it intends to seek approval and assignment of executory

7  contracts and nonresidential real property leases.  To the

8  extent it does not, it is the understanding of the parties

9  that the estate will have the burden, financial or otherwise,

10 to physically deliver the assets that my client is buying.

11 So, for instance, if there is a landlord with a lease that is

12 not assumed and assigned, and the landlord has a piece of

13 equipment on the premises, we are buying that equipment free

14 and clear.  And the order, as the parties contemplate it,

15 would provide protection to my client that it can get that

16 equipment.

17         If I didn't mention the time period, in terms of

18 the continuing order of Your Honor keeping the going-forward

19 service providers providing services, it's the parties'

20 understanding that that order would provide the time period

21 of the next 60 days.

22         Both parties will work diligently starting

23 immediately at the conclusion of this hearing to paper the

24 transaction.  In addition, the estate will cooperate and use

25 its best efforts to assist the buyer in terms of getting

1  regulatory approvals and the like.

2          My firm is holding 15 million dollars cash in an

3  escrow account.  I will work with debtors' counsel to work

4  out an escrow agreement.  Upon conclusion and the

5  satisfactory manner of that, we will forward that money to

6  the estate's counsel.

7          We are going to work on a management agreement,

8  which I won't burden the record with, that is necessary for

9  regulatory reasons and the like.

10          (Pause.)

11          MR. ALBALAH:  Thank you, Your Honor.

12          The 30 million dollars to cover -- as I said, the

13  buyer will be responsible for the ongoing expenses of the

14  business.  There will be 30 million dollars regarding that

15  that we will put in escrow.  That doesn't mean it will cost

16  30 million.  It may cost less or more.  We are going to put

17  30 million dollars in escrow.  And I neglected to mention

18  that earlier.

19          The purchase price, whatever form it comes in,

20  cash or stock, cash, or cash and stock, will be paid at

21  closing in an irrevocable manner.

22          I think I used the word guarantee in terms of the

23  estate delivering the assets.  And if there is a piece of

24  equipment, and the landlord doesn't want it, guarantee is the

25  wrong word.  It is the intent they will get all those

1    assets.  If there is a cost in terms of physically removing

2    it, the buyer would pay those costs.

3            Your Honor, if I may, Howard Jonas, the chairman

4    of the company, chairman of the board of IDT, is here.  May

5    he address Your Honor very briefly?

6            THE COURT:  Sure.

7            MR. JONAS:  Thank you.

8            I, fortunately, have never been in court before.

9            I think this is a very good deal for the public,

10   because I think there is a need for competitive telephone

11   service.  And in our diligence on the company, we found an

12   Intelligent, which is a company that we previously controlled

13   and made an offer for, even though unfortunately it wasn't

14   accepted at the time, and the business went down the hill,

15   but the business was not put together properly.

16           We do over a billion and a half dollars in

17   telecom business a year.  We are noticing a technical

18   infrastructure and a business infrastructure so poorly

19   operated.  It is our hope -- what we are planning to do is

20   one of two things.  We will probably have to terminate a lot

21   of the clients who are on net now, but we will be giving them

22   sufficient time to get out so they can get other services.

23   We are hoping a lot of the other services, like long-distance

24   services and data services and so forth from our company, it

25   is our intent to restart the business in the proper way with

1    the proper knocks in the proper cities, so we can provide the

2    service to the public, and hopefully there will be a number

3    of clients that we will be able to keep on who are already

4    on.

5         So I think approving this order serves the dual

6    purpose of, I can't say that the creditors are made whole

7    because they are six billion dollars in the hole, but it does

8    get them money, it does see that the public is not left

9    without telephone service for a long time, and somebody is

10   not forced to pay for it who doesn't want to be a creditor

11   anymore, and it does give a reasonable chance that we will be

12   able to continue operating these kind of services into the

13   future.

14        The last thing is our company has over a billion

15   dollars in cash, over a billion dollars in paid-up assets.

16   We turn a profit of close to a hundred million dollars a

17   year.  We have zero debt.  We will easily be able to carry

18   through and finance this acquisition and see that all the

19   commitments that our counsel made are in fact complied with.

20        I hope this doesn't have to go on to tomorrow.

21   You can order it tonight.

22        But that's all I want to say, thank you.

23        THE COURT:  Thank you, Mr. Jonas.

24        MR. SHAPIRO:  Mr. Albalah also wanted me to put

25   on the record that they will have the ability to speak with

1    management and have input to speak with management tomorrow

2    morning, which we agreed to.

3            I think, notwithstanding the fact that all, I

4    will call it, the salient points have been put on the record,

5    obviously, until we have a contract that is agreed to and

6    signed by the buyer and debtor, there is no agreement.  So

7    what we would try to do is between now and 3:00 p.m. tomorrow

8    complete a contract.  We have actually already worked on

9    contracts, obviously, with them and other people, so we have

10   a basic form of contract that we will work on tonight, see

11   whether we can reach an agreement, and be back here tomorrow

12   to see whether we can get it approved.

13           THE COURT:  All right.  Mr. Kenney, did you have

14   anything you wanted to add?

15           MR. KENNEY:  I think, Your Honor, what we have

16   heard is good.  I am obviously going to have to wait and see

17   what develops between now and 3:00 p.m. tomorrow, at which

18   point I would make any comments I have and anyone else would

19   have the opportunity to do so then.

20           THE COURT:  When would you anticipate, Mr.

21   Shapiro and Mr. Kenney, because I want you to review any

22   proposed agreement, that that would be available for people

23   to review?  We are going to come at 3.  I would like to have

24   a little time.

25           MR. SHAPIRO:  In fairness to everyone, I would

1    think by 12:00 tomorrow we need to have a contract

2    available.  We will send Your Honor whatever we have or

3    inform the Court we don't have an agreement.  But I think at

4    that point anyone who would like a copy ought to get in touch

5    with Pauline Morgan at Young Conaway, get her e-mail address,

6    so we have it in e-mailable form so we will e-mail it to

7    people starting at noon tomorrow.

8               THE COURT:  So we have the principles of

9    agreement.  And you are going to work to get it to a document

10   by noon tomorrow, so that it is available for purposes of the

11   3:00 hearing.

12              MR. SHAPIRO:  As well as the form of order we

13   would ask Your Honor to sign.

14              THE COURT:  The proposed form of order.  Mr.

15   Kenney?

16              MR. KENNEY:  That is fine, Your Honor.

17              MS. NEWELL:  Hello, Your Honor.  Margaret Newell

18   from the Department of Justice on behalf of the FCC and the

19   GSA.

20              Obviously, my comments about the order can wait

21   for tomorrow.  But I wanted to clarify, there is a hearing

22   scheduled tomorrow at 3:00 before Your Honor, but given the

23   fluidity of events today, there wouldn't be a hearing before

24   that time, would there?

25              THE COURT:  No.  Before 3:00 tomorrow on this

1    matter, no.

2              MS. NEWELL:  Thank you, Your Honor.  Just

3    checking.

4              THE COURT:  Okay.  The only thing that I am going

5    to do between now and 3:00 tomorrow is, or I have already

6    done it, I have extended the temporary restraining order that

7    was entered last week till 5:00 p.m. tomorrow, so that we

8    would have an opportunity, in the first instance, to proceed

9    to a conversion, but now to proceed to consider this

10   agreement.

11             So that's the only thing I am going to do between

12   now and tomorrow at 3:00.

13             All right.

14             MR. GWYNNE:  Your Honor, Kurt Gwynne on behalf of

15   MCI Worldcom.

16             I understand Your Honor is continuing the TRO.

17   Notwithstanding that, may I be heard on that issue, Your

18   Honor, just to create a record?  I have talked with my client

19   about the potential -- well, I have put in a call to the

20   client about the potential for appealing that.  The client is

21   on a flight to Chicago.  I would like to make a few

22   statements for the record.

23             THE COURT:  Sure.

24             MR. GWYNNE:  Thank you.  First of all, Your

25   Honor, as I think Your Honor knows, I have a tremendous

1    amount of respect for this Court and am proud to be a member

2    of the Bar of the District Court for the District of

3    Delaware.

4               THE COURT:  You must really want something.

5               MR. GWYNNE:  Your Honor, I have significant

6    concerns about the manner in which the original TRO was

7    entered and the manner in which the TRO was continued today.

8    Under Rule 65, it is clear that in order for a TRO to be

9    issued ex parte, counsel is supposed to exercise, quote, all

10   reasonable efforts, close quote, to notify opposing counsel.

11              Although I had called and left messages for

12   debtors' counsel the night before, just curious about the

13   sale process, I was never told about any TRO process.  And in

14   fact, when the motion was filed, although it wasn't filed

15   until 12 or 18 minutes before the hearing, it obviously was

16   prepared sometime during the day, as it was five or six

17   pages, had a four-page affidavit.  No telephone call was ever

18   made to me.

19              I think with respect to that, Your Honor, that

20   TRO was improperly granted for that reason, should not have

21   been issued ex parte.  And also, it is my understanding,

22   since I was not at that hearing, that the TRO did not even

23   issue at the hearing but issued as a result of a conference

24   in chambers.

25              We filed --

1    THE COURT:  I think, actually, it issued at the

2  end of a Court hearing, when I asked Shearman & Sterling to

3  present it predicated on the argument of the FCC.

4    MR. GWYNNE:  Your Honor, again, without

5  sufficient notice, I am not really sure what happened, unless

6  and until we obtain a transcript.  Then when the hearing was

7  scheduled for today, we filed an objection, which I don't

8  know if Your Honor had time to read it.  I realize it was on

9  file only two hours before.  But today, we understood that

10  the carriers, many of which are here today, were coming to

11  Court and would have the opportunity to have some discussions

12  with Your Honor about the TRO and/or the sale or winddown

13  process and what, if anything, the carriers were willing to

14  do.

15    Debtors' counsel came out of chambers and advised

16  us that the TRO was going to be continued.

17    Your Honor, I think, respectfully, with the

18  carriers being here in court, and debtors' counsel knowing we

19  were in court, I don't know if Your Honor knew, we should

20  have had an opportunity for a hearing, which hearing should

21  have been an evidentiary hearing, on whether or not the TRO

22  should have continued till tomorrow.

23    Debtors owe, under our original adequate

24  assurance agreement, 13.9 million to Worldcom.  Under the

25  modification agreement, where we made significant concessions

1    with the debtor, it is not scheduled to be heard until the

2    20th, the debtors would only owe approximately 2.9 million,

3    still a significant amount owed under the adequate assurance

4    stip as modified by what I call the modification agreement.

5              Under the adequate assurance, which was a

6    stipulation and order, we have the right to terminate based

7    upon certain postpetition defaults.  Not only was that an

8    agreement of the parties, but it was an order of this Court,

9    which no one has filed a motion to vacate, to modify, nor do

10   we think that that obviously would be the appropriate relief.

11             There is no adversary proceeding here, Your

12   Honor.  We have a TRO that has been issued based upon a

13   motion for a TRO and now a motion for a preliminary

14   injunction.

15             Injunctive relief requires an adversary

16   proceeding under Rule 7001, Subsection 7. And in In Re

17   Connectus, Your Honor held that a hearing was enjoined base

18   upon an oral motion before Judge Walrath that a lack of a

19   required adversary proceeding was a basis alone to deny the

20   request for injunctive relief.

21             THE COURT:  Are you of the view that, for

22   instance, your client could terminate service tonight absent

23   that temporary restraining order?

24             MR. GWYNNE:  No, Your Honor.  We have a two-day

25   notice period under our contract with the debtor and we have

1   never sent a termination notice, to this day, we haven't.

2   And we were surprised to be included in the ex parte motion,

3   when we hadn't even issued a termination notice.

4           THE COURT:  But you could do it within 48 hours.

5           MR. GWYNNE:  I believe, Your Honor, under our

6   adequate assurance stipulation, which specifically provides

7   we can terminate in I think it's two business days or 48

8   hours notice, yes, we can.

9           Now, I understand the FCC has raised some issues

10  about termination periods and notice.  Under Section 214 of

11  the Telecommunications Act, the debtor has a duty to give

12  notice to its end users.  We are not providing service to the

13  end users.  This is carrier-to-carrier service.  There is no

14  requirement that we give any period of notice to the debtors

15  unless it's required by some applicable tariff or contract or

16  what have you.

17          So we do believe that we could terminate in two

18  business days notice.  In fact, Your Honor, we have done that

19  in many other cases where there have been defaults, and other

20  cases that have sort of headed south the way this one has.  I

21  do believe we could.  I am not asking Your Honor to give us a

22  right we don't have.

23          THE COURT:  I am just trying to understand,

24  because the FCC takes a different view.  And what I could do

25  is I could schedule a hearing to give you an opportunity to

1  be heard against the FCC's issues and in the meantime leave

2  the order in place, and we could have a quick hearing,

3  because I think that's what you are asking for, an

4  opportunity to be heard, because of the disagreement that

5  your clients would have with the position that was put forth

6  by Mr. Scheimer (phonetic) on behalf of the FCC. Then I

7  could resolve that, the tension between those positions. I

8  wouldn't be able to do it at 3:00 tomorrow, just like I

9  wasn't able to do it today, because I only scheduled the sale

10 hearing for today. But we could do it certainly before the

11 end of the week and have that heard.

12             MR. GWYNNE:  We would appreciate the opportunity

13 to do that. But with respect to whether or not the TRO

14 should issue, again, we haven't given the termination

15 notice. Whether or not the TRO should even be continued,

16 which would involve those issues, which we would be happy to

17 address at a hearing, would also involve whether or not --

18 again, Your Honor held in In Re Connectus that the Bankruptcy

19 Court couldn't use 105 to overrule the utilities' rights

20 under 366, albeit for a short time. That was only a four-day

21 injunction that Judge Walrath entered. Your Honor properly

22 reversed her for doing so, enjoining a utility in violation

23 of Section 366. I think that's the same thing that is going

24 on here.

25             THE COURT:  I don't think anybody in that case,

1    and in my mind, at least at this point, who is potentially

2    distinguishable ever raised what Mr. Scheimer raised.

3              MR. GWYNNE:  Which is, Your Honor?

4              THE COURT:  His issue is about the amount of time

5    necessary for termination.  I understand your view that you

6    are not a provider in the sense that the debtor is and that

7    your relationship with the debtor is the debtor has the

8    obligation.

9              MR. GWYNNE:  Correct.

10             THE COURT:  But I don't recall the FCC appearing

11   in Judge Walrath's case.

12             MR. GWYNNE:  I don't believe so, Your Honor.

13   Frankly, as I understand it, this is the debtors' motion, not

14   the FCC's motion anyway.

15             THE COURT:  Absolutely.  But the FCC weighed in

16   on their behalf, agreeing with what other folks wanted to

17   happen when we had the hearing on December 10.

18             MR. GWYNNE:  Your Honor, the only thing we would

19   ask is during that time period prior to the hearing, who is

20   going to pay the charges that are being incurred?  We think

21   that we are entitled to that.  While Rule 65 provides that

22   the Court can enter injunctive relief and the debtor not have

23   to post a bond, if Your Honor is ordering us to provide

24   services to the GSA or some government entity or

25   quasi-government entity --

1          THE COURT:  Have you met Mr. Jonas?

2          MR. GWYNNE:  Yes, Your Honor.

3          THE COURT:  As I understand it, if his

4  transaction is approved tomorrow, he wants to talk with you

5  about that very issue.

6          MR. GWYNNE:  But I don't understand that he was

7  going to pay for postpetition charges that have been incurred

8  but not paid and enter a default now.  They are talking about

9  going forward, which I assume is from tomorrow until sometime

10  forward.

11          THE COURT:  You are talking about since December

12  10th.

13          MR. GWYNNE:  There is from the 10th to today,

14  Your Honor.  There is also charges that are due and owing

15  from prior to the 10th as well.

16          THE COURT:  I am only liable from the 10th.

17          (Laughter.)

18          I think I have immunity.

19          I am taking this seriously.  I am trying to

20  understand.  But I can't deal with before the 10th, you know,

21  in the context of what you are presenting today.  If the sale

22  is approved tomorrow, Mr. Jonas' transaction takes care of

23  that.  So we are talking about from the 10th to either today

24  or tomorrow at 3:00.

25          MR. GWYNNE:  Whenever the hearing is.  Or if the

1          THE COURT:  Have you met Mr. Jonas?

2          MR. GWYNNE:  Yes, Your Honor.

3          THE COURT:  As I understand it, if his

4    transaction is approved tomorrow, he wants to talk with you

5    about that very issue.

6          MR. GWYNNE:  But I don't understand that he was

7    going to pay for postpetition charges that have been incurred

8    but not paid and enter a default now.  They are talking about

9    going forward, which I assume is from tomorrow until sometime

10   forward.

11         THE COURT:  You are talking about since December

12   10th.

13         MR. GWYNNE:  There is from the 10th to today,

14   Your Honor.  There is also charges that are due and owing

15   from prior to the 10th as well.

16         THE COURT:  I am only liable from the 10th.

17         (Laughter.)

18         I think I have immunity.

19         I am taking this seriously.  I am trying to

20   understand.  But I can't deal with before the 10th, you know,

21   in the context of what you are presenting today.  If the sale

22   is approved tomorrow, Mr. Jonas' transaction takes care of

23   that.  So we are talking about from the 10th to either today

24   or tomorrow at 3:00.

25         MR. GWYNNE:  Whenever the hearing is.  Or if the