# EXHIBIT 9
## PART 2 OF 2

1  sale goes forward, right.  That's correct, Your Honor.

2         THE COURT:  What we should do is, I understand

3  MCI is not going to turn anyone's phone off or service off

4  between now and tomorrow at 3:00.

5         MR. GWYNNE:  Correct.  We wouldn't have the right

6  to do it.

7         THE COURT:  Even under your analysis of the two

8  days.  So that is kind of like a no prejudice, if I enter the

9  order, because I am concerned about everybody else.

10         MR. GWYNNE:  You could carve Worldcom out.  There

11  is precedent, with all the attorneys in this room, debtors'

12  counsel, somebody will be saying to Judge Robinson, this

13  order is the standard injunction, Judge.

14         THE COURT:  I don't even understand that word,

15  precedent.

16         MR. GWYNNE:  I realize it doesn't have any

17  binding precedent.

18         THE COURT:  It really doesn't.  And this case is

19  so unusual, because of the public interest, that I would be

20  literally shocked if another judge out there said there was

21  something here to be followed in the orders I have issued to

22  get us to this hearing tomorrow at 3:00.  I guess that's

23  possible.  But actually, there is an opinion out there by

24  Judge Mansley in an asbestos case that talks about there is

25  no precedent to be followed in the same court or in different

 1   courts at the same level.  But there is no precedent here.

 2   This is truly a unique case.

 3              MR. GWYNNE:  Since we won't be terminating, we

 4   may issue a notice, but there is not going to be any

 5   termination before tomorrow, could we have the hearing

 6   scheduled?

 7              THE COURT:  What I am thinking about doing is

 8   giving you a hearing tomorrow after the sale hearing, or the

 9   next day.  I don't know how long the hearing will take

10   tomorrow.

11              MR. ALBALAH:  Your Honor, may I suggest, to

12   address Mr. Gwynne's concern with respect to the injunction

13   as distinguished from with respect to getting payment from

14   the 10th until the closing of our transaction, I think his

15   concern is whether the injunction that we have asked Your

16   Honor to continue is permissible from a procedural and

17   substantive standpoint.  Therefore, I think it is necessary,

18   given that a condition precedent to our deal is to have the

19   continuation of that injunction, that this hearing be

20   scheduled at the same time or before our transaction is

21   hopefully approved.

22              Do you understand what I am addressing, Your

23   Honor?

24              MR. GWYNNE:  We could go first at 3:00.

25              THE COURT:  I understand.  But I just see it a

1    little differently.  I would take it afterwards, particularly

2    since you are going to be negotiating with them, you would

3    probably want it afterwards, too, I would think, because we

4    might have a different situation.

5         MR. GWYNNE:  I understand.

6         THE COURT:  What I am going to do is schedule you

7    for tomorrow for the agenda, but presently, my thought is

8    that I will hear any application you have subsequent to the

9    sale application.

10        MR. GWYNNE:  Thank you very much, Your Honor.

11        THE COURT:  Again, I wanted to get your position

12   clear and have some reference to what occurred previously.

13        Is there anything else you want to put on the

14   record with regard to your client's position?

15        MR. GWYNNE:  No, thank you, Your Honor.

16        MR. PALACIO:  Good evening, Your Honor.  Ricardo

17   Palacio from Ashby & Geddes on behalf of Williams

18   Communications as well as Time Warner.  I am going to address

19   the Williams Communications/Time Warner position as merely a

20   joinder to the motion to vacate and the objection to

21   preliminary injunction.

22        To start off, I would like to join in and

23   basically echo the comments made by Mr. Gwynne.  I think

24   Williams Communications, it is one of the largest carriers to

25   the debtors, has much at stake here, to say the least, as

1  such incorporates the comments of Mr. Gwynne.

2          Your Honor, there is one spin with respect to

3  Williams Communications that has been different from

4  Worldcom, and that is with respect to the notice.  In our

5  motion/objection, if you will, again, I don't know if Your

6  Honor had an opportunity to review it, but the one difference

7  I am referring to is that prior to the issuance of the TRO,

8  Williams had terminated its obligation to provide further

9  services to Winstar.  Subsequently, thereafter, after

10  terminating its obligation, it commenced the issuance of

11  notice to the appropriate regulatory agencies, both state and

12  federal level, and the time period runs anywhere from ten to

13  30 days, depending on the jurisdiction.

14          Some of those notices have already gone out.  The

15  impact of the TRO on those notices -- we understand, Your

16  Honor, we are not to cut off any service.  However, Your

17  Honor, we believe that this puts a little bit of a different

18  spin on what Worldcom has asserted, and we would again like

19  the opportunity, as I am sure many other carriers, to come

20  forward before Your Honor and seek a vacation, if you will,

21  of the TRO.

22          Quite frankly, we have the same issues with the

23  postpetition obligations, as well as the debt that is

24  incurring each and every day at this pace, we are incurring

25  approximately $170,000 a day that goes unpaid.  I think there

1   are some issues that go to the proposed, quote-unquote,

2   selling and terms of the deal, as far as any assurance of

3   being paid on a going-forward basis.

4               That is what I wanted to get on the record.  We

5   would request also that we be heard prior to the sale itself.

6               THE COURT:  Thank you.

7               MR. KIRPALANI:  Good evening, Your Honor.

8   Susheel Kirpalani of the firm Milbank Tweed Hadley & McCloy.

9   I will be very brief, Your Honor.  We appreciate the Court's

10  indulgence and your expertise in trying to facilitate this

11  transaction.

12              I wanted to confirm, Your Honor, that other

13  competing bidders will have an opportunity to outbid IDT's

14  bid provided that their 15-million-dollar deposit is within

15  Shearman & Sterling's account prior to the hearing tomorrow.

16              We have, we believe, fully negotiated a purchase

17  agreement that has been circulated to debtors' counsel as of

18  this morning.  And subject to understanding the terms and

19  conditions of the competing bid, I will contact Ms. Morgan

20  from Young Conaway.  We just wanted to make sure the record

21  was clear with respect to competing bidders.

22              THE COURT:  I don't want to get into that part of

23  it because I think it would be inappropriate.  But I

24  assume -- I don't know anything about this -- I was told that

25  there was no consummated agreement.  But if there was, you

1  should be talking with Mr. Shapiro.  And if there is 15

2  million dollars or whatever the conditions were that's been

3  deposited or wired as we were talking about a week ago and

4  that came before me, there were two competing bids, then I

5  would have to make a decision between them.

6          But I am not going to get into the detail of

7  where you are with Mr. Shapiro and the debtor.  In my view,

8  nobody is foreclosed, because I can't do that.  And if you

9  are not able to talk to Mr. Shapiro because, for whatever

10  reason, you think that you have a better offer, I assume you

11  will be here at 3:00 tomorrow to tell me what a terrible deal

12  the debtor has negotiated and why I shouldn't approve it.

13          MR. KIRPALANI:  We hope to be, Your Honor.  Thank

14  you.

15          MR. SHAPIRO:  Just to clarify the record.  I

16  don't think Mr. Kirpalani means to suggest that we had a

17  fully documented agreed-upon contract.  As he knows, there

18  are at least half a dozen or more issues that we have been on

19  the phone discussing since last Monday that haven't been

20  resolved.  So I don't think --

21          THE COURT:  As I understood it, the biggest issue

22  was they couldn't come up with the money.

23          MR. SHAPIRO:  That was a really big issue, Your

24  Honor.  They didn't come up with the money nor have they come

25  up with the money.

1    THE COURT:  So you decided it wasn't worthwhile

2  to keep talking.

3    MR. SHAPIRO:  We decided to suspend discussions

4  about 7:00 Friday night until they could show us that they

5  actually had the money.  Unfortunately, they didn't today

6  come up with the money.  I think, more importantly, if they

7  were to come up with the money between now and when we come

8  to Court tomorrow, that's just one, as Your Honor has heard

9  before, that is just one segment of this transaction.  As has

10  been expressed by IDT, there is a need to be able to show

11  that the purchase price can be paid and that the operations

12  can be funded, which are equally important.

13    THE COURT:  You would understand that because you

14  would be trying to knock out Mr. Jonas' company.

15    MR. KIRPALANI:  That's correct, Your Honor.

16    THE COURT:  He has represented that he has got

17  the wherewithal to fully perform.  But it would probably

18  behoove you, Mr. Shapiro, just to listen about those other

19  five or six issues, so that if you come tomorrow and you are

20  supporting Mr. Jonas' company's bid, that you are at least

21  prepared for what others might claim to be a better

22  transaction.

23    MR. SHAPIRO:  What I would propose, since there

24  obviously is a limited period of time between now and 12:00

25  tomorrow when we still have to try to finish a contract, and

1  we have been talking to his client now for a few weeks, we

2  are going to present a contract, as I said, at noon

3  tomorrow.  Anyone who is interested in bidding can bid off

4  that contract.  If they want to change the contract, they can

5  describe it in court tomorrow.  The IDT contract will be the

6  contract offered which other bidders can bid off, not the

7  current contract that we have been negotiating with his

8  client, because unfortunately his client didn't show up with

9  the money with which we were going to do a deal.

10         THE COURT:  That is all you are asking for.

11         MR. KIRPALANI:  Yes, Your Honor.  It is subject

12  to understanding the agreement with IDT.  Quinn Telecom

13  Holdings believes it is much more of a going-concern offer.

14  The five or six points that Mr. Shapiro mentioned were fully

15  discussed on Friday with Blackstone and Shearman & Sterling.

16  And what I meant earlier with respect to we believe those

17  issues had been resolved, in terms of documenting and

18  papering it, the agreement we circulated this morning covered

19  our offer, and we have not heard back obviously because there

20  was a lot of dealings going on today.

21         But we will certainly look at the IDT agreement.

22  If it fits outside the liquidation type agreement and it fits

23  a going-concern value type agreement, that will benefit the

24  customers and the employees, in particular, then we will

25  certainly work off of that agreement.  I have no intention to

1  recreate the wheel at all.

2         MR. SHAPIRO:  Again, for the record, what we will

3  be asking IDT to do is show up with the 15 million dollars

4  plus all of the funds that are needed to operate the business

5  for the 30-day period plus the funds for the purchase price

6  of 38 million dollars.  Anyone who chooses to show up

7  tomorrow with that much cash we would be happy to talk to.

8         MR. ALBALAH:  Your Honor, may I very briefly.

9         (Counsel confer.)

10         MR. ALBALAH:  Your Honor, this is something we

11  danced around but I want to confront now head on.  I spoke

12  very briefly with a representative of Blackstone Group.  You

13  saw me speak very, very briefly of debtors' counsel.  You

14  heard the chairman of the board of IDT Corporation.  You know

15  the financial wherewithal of my client.  The debtor, its

16  advisors, have, as Your Honor painfully knows, has been

17  spending a fair amount of time keeping the telecom providers

18  of the world at bay, waiting for --

19         THE COURT:  You just gave him more pain.

20         MR. ALBALAH:  -- waiting for Mr. Zimmerman to come

21  up with money to close the case.  Your Honor, obviously,

22  accurately portrayed why the debtor stopped that process.  We

23  are here.  We read the salient points of the agreement into

24  the record.  We are prepared to close.  We would like, as a

25  condition to that arrangement, in the event that we are

1  ready, willing, and able to close, and Mr. Zimmerman comes up

2  with the money, we view, I view, categorically, that

3  benefited the estate, I respectfully submit, there is no way,

4  to the extent that Mr. Zimmerman does come up with the money,

5  there is no way that he would have, or there is no way that

6  the estate would have been in as good of a position that it

7  will be in tomorrow but for IDT.

8          Therefore, it is customary, as Your Honor is

9  well-aware, for a reasonable breakup fee, I believe a

10  two-and-a-half-percent breakup fee, in the event that we are

11  prepared to close, is reasonable in these circumstances.  And

12  I would respectfully request that Your Honor now, so that

13  when we work literally around the clock to get this deal

14  done, we know that we are working and IDT knows that IDT's

15  professionals are working around the clock so that they

16  either get the deal or they benefit the estate.

17          MR. KIRPALANI:  Your Honor, briefly.  In terms of

18  who has been working around the clock to get us to where we

19  were, I didn't think it was IDT.  But I would not comment on

20  the breakup fee at this time.

21          MR. SHAPIRO:  Your Honor, I have never come

22  before a Court for a breakup fee without a signed contract in

23  hand.  We don't have a signed contract in hand.  I think IDT

24  is obviously showing they are interested in this, and

25  hopefully without the breakup fee they would be willing to

1   work the night to get this done.  So I would respectfully

2   disagree with counsel to IDT and say let's go forward on the

3   basis that we have previously discussed.

4           MR. ALBALAH:  Your Honor, you know better than

5   anyone because the first thing I asked you was to so order

6   the record, there is no better way -- obviously, we can't

7   manufacture documents now.  By requesting the Court to so

8   order the record, I respectfully suggest that it's clear that

9   we are ready to close.

10          When Mr. Shapiro suggests that normally there is

11  no breakup fee without a signed agreement, I agree with Mr.

12  Shapiro.  But as Your Honor correctly said, this is not the

13  normal case.  We are coming in here, we believe, I don't want

14  to be melodramatic, but we are coming in here and providing

15  excellent exit strategy for everyone, for the Court, for the

16  telecom companies, for the debtor, for the bank.

17          I submit that it is simply wrong to have IDT

18  provide that benefit without being compensated in the event

19  that the benefit that it gives the estate, the estate

20  benefits.  The fact there is no signed agreement, we are

21  prepared to so order the record.

22          THE COURT:  I know everybody is anxious and kind

23  of rushing over issues.  But you want to put a breakup fee in

24  your deal.  You have every right to negotiate that with the

25  debtor.  When that document is done at 12:00, that will

1    either be in there or not.  I don't get into that today in

2    any way.  But there is nothing that prevents you from further

3    negotiating that with the debtor.  And then your document,

4    with or without that fee, goes out for public scrutiny and

5    if -- who is the other bidder -- Mr. Zimmerman, if he decides

6    that he can qualitatively and quantitatively up your offer,

7    he will have a chance to do that and you will have your

8    breakup fee in it.

9             Again, I don't want to get into that detail,

10   because I am supposed to sit back and be objective at 3:00

11   tomorrow about whatever comes before me.  So I don't want to

12   participate.  But, I mean, you know how to get your breakup

13   fee, and it's by negotiation into your written document that

14   is going to be the subject of the 3:00 hearing.

15            MR. ALBALAH:  Actually, I respectfully submit

16   that it can't -- I don't want to -- I don't think it will

17   work that way because of the following reason.  We are here

18   tomorrow.  If Mr. Zimmerman comes up with the 15 million

19   dollars and the adequate assurance of closing and the

20   carrier, there would be no incentive -- again, I am not

21   trying to talk against my interest -- but at that point in

22   time, there would be no incentive whatsoever for the debtor

23   to support a breakup fee because the debtor, if it has the

24   assurance --

25            THE COURT:  If he does it before 12:00, you are

1  right.

2         MR. ALBALAH:  What I am suggesting --

3         THE COURT:  If Mr. Zimmerman puts more end money

4  on the table, and his -- Mr. Kenney, did you want to say

5  something?

6         MR. KENNEY:  I will wait, Your Honor.

7         THE COURT:  -- that will happen.

8         MR. ALBALAH:  What I am asking, Your Honor, is if

9  we are here tomorrow, ready, willing, and able to close...

10        THE COURT:  At 3:00.

11        MR. ALBALAH:  Yes. ...and Mr. Zimmerman, or for

12 that matter anyone else, comes out of the woodwork, and the

13 debtor, which I believe is expressing a change in position --

14 it was my understanding loosely that it was the debtors'

15 opinion --

16        THE COURT:  I don't think the debtor is shopping

17 your offer.  It is just that everybody wanted to come into

18 Court and put it on the record.  In essence, they are

19 record-shopping your offer.  I guess Mr. Zimmerman knows what

20 your deal is now.

21        MR. SHAPIRO:  Maybe I can suggest something he

22 would find acceptable.  We are going to try to reach a

23 contract with them by noon tomorrow, maybe even tonight.  If

24 we have a signed contract and as Your Honor suggested if they

25 insist as a condition that there is a breakup fee, the debtor

1    if they sign that contract will be bound by that contract.

2              THE COURT:  That's right.

3              MR. SHAPIRO:  Then we have a contract upon which

4    I am comfortable coming to Your Honor and saying as part of

5    this we have a breakup fee.  Right now we have nothing.  We

6    don't have a contract.  We have an expression of intent.

7    When we get to a contract and have a breakup fee, we can come

8    before Your Honor tomorrow.

9              MR. ALBALAH:  I accept that proposal in large

10   part and I appreciate the creativity and flexibility.

11   Normally, as Your Honor knows, this would be the time the

12   Court would say, if we do that, Your Honor now approves the

13   breakup fee, because otherwise, there is no order.  Normally,

14   there are bidding procedures which contemplate a breakup fee.

15             THE COURT:  What I can tell you is if in any case

16   that comes before me somebody proposes a deal that goes to a

17   written contract and it has a breakup fee in it, and that

18   contract ultimately motivates someone else to come in and pay

19   a lot more money, they get their breakup fee.

20             MR. ALBALAH:  Thank you, Your Honor.

21             THE COURT:  I don't know what is going to happen

22   in this case, because there is no written document for me to

23   consider.

24             MR. KIRPALANI:  Nor do I think there is any

25   evidence that IDT's interest is what stirred Wintel's

1    interest in any sense.  We have always been negotiating

2    subject to obtaining financing.  IDT was at the auction just

3    like Wintel telecom was at the auction.  If there was a time

4    to start up interest, it would have occurred a long time ago.

5            THE COURT:  Write that down and tell me tomorrow,

6    if things don't go well.

7            MR. KENNEY:  Your Honor, he backed down.  I don't

8    need to say anything.

9            MR. ALBALAH:  For the record, I don't know if I

10   backed down, but the record speaks for itself.

11           MR. WHITE:  Your Honor, Bill White for

12   BellSouth.  Did I understand Your Honor correctly that any of

13   the service providers who wish to be heard tomorrow on the

14   issue of the temporary restraining order will be able to be

15   heard?

16           THE COURT:  Yes.

17           MR. WHITE:  The other issue I wanted to raise

18   with Your Honor was this particular proposal that the Court

19   indicated would be available at noon with a hearing at 3:00,

20   I don't see realistically how the carriers will be able to

21   review that proposal, particularly to be able to consult with

22   their clients to determine whether they would oppose that.

23           This particular proposal, the scheduling of this,

24   alters even the bid procedures order, which itself was fairly

25   truncated.  I am concerned about, particularly in light of

1    the supplemental motion that was filed by the debtor over the
2    weekend, that the carriers that I have discussed it with have
3    a number of problems because of the potential for the
4    assumption and assignment of contracts under the guise of the
5    sale of assets.
6              So I can only say that I think that three hours
7    notice for a deal to the service providers who are the
8    biggest constituency that are going to be affected by this is
9    too short.
10             THE COURT:  All right.  Thank you.
11             MR. SHAPIRO:  Just in response to that, Your
12   Honor.  I think the salient points of the deal were put on
13   the table tonight.  He obviously can get in touch with his
14   client and has the better part of tomorrow.  Obviously, it is
15   very short.  On the other hand, I think that this is a deal
16   that if we can make it happen, it is in everyone's interest,
17   and therefore he ought to take the name of counsel to IDT and
18   have his client speaking to them between now and 3:00
19   tomorrow.
20             MR. PALACIO:  Your Honor, I apologize.  On behalf
21   of Williams.  Your Honor, I just want to touch on that last
22   point briefly.  What they are doing when they say the salient
23   terms have been discussed, what their salient terms are, at
24   least one of them is a de facto assumption and assignment.
25   There is a big issue there.

1          A lot of the telecoms, a lot of the other

2    creditors in this case, for lack of a better word, have an

3    issue there.  So by saying there is salient terms, get in

4    contact with somebody, we are talking about 18 hours really

5    to hammer out their differences.  And you are not talking

6    about a couple thousand dollars.  You are talking millions

7    and millions of dollars here.

8          When they sent out their cure objection notices,

9    if you will, with respect to Williams, they said, certain

10   contracts, we had no idea what contracts they are talking

11   about.  It is something that is not that easy.  That is the

12   one issue I wanted to highlight for Your Honor before we go

13   on this course, if you will, of contacting them and see if

14   you can work something out by tomorrow.

15         The second is merely a request for Your Honor,

16   that is with respect to my co-counsel, who flew from

17   Oklahoma, has since left, has asked to the extent Your Honor

18   is inclined to grant a hearing on the TRO, which Your Honor

19   has, that he be able to participate telephonically.

20         THE COURT:  Well, I have to be careful about

21   that, because the numbers of people that are involved, I

22   don't know if we can do that.  But to the extent we can,

23   mechanically, I will allow it.

24         MR. PALACIO:  Thank you, Your Honor.

25         MR. SHAPIRO:  Your Honor, to address the point.

1    I don't think there is any intention of assuming or assigning

2    any contracts whatsoever tomorrow.  That is not the game

3    plan.  The game plan is to close a contract with the buyer.

4    The buyer would then have the right for a period of time to

5    determine which contracts it wants to assume and have assumed

6    and assigned to it or not have assumed and assigned to it.

7            In the meantime, as I think you heard, the buyer

8    understands that they are picking up all accruals that would

9    occur from the time they take over the business, the closing

10   date, forward, they are not picking up any arrearages.  We

11   are talking about nobody having to deal with the notice

12   period for a cure amount tomorrow or anything like that.  We

13   are talking about that being done in the future if and to the

14   extent the buyer determines that any of the contracts should

15   be assumed and assigned.

16           MR. PALACIO:  Your Honor, with all due respect to

17   Mr. Shapiro, my point is to the extent this sale goes

18   through, one of the terms there requires that the service

19   providers continue and are obligated to provide service.  If

20   that is the case, they are basically taking that obligation

21   that is already there and transferring that pursuant to a

22   sale.  You can't have a sale without an assumption and

23   assignment.  That is my point.  Then there is a cure issue

24   there.

25           MS. SAWCZUK:  Your Honor, Maria Sawczuk on behalf

1   of Eastwire (phonetic) Communications.  I will be very

2   brief.

3                I wanted to bring it to Your Honor's attention

4   that I believe Eastwire is the only service provider at this

5   point that is also in bankruptcy.  So to the extent any of

6   these negotiations affect or change or modify the claims that

7   Eastwire has in this bankruptcy, it may be necessary -- I am

8   not going to opine on this at this point because I am not

9   entirely sure how it is going to be affected -- it may be

10  necessary to bring those changes to our Bankruptcy Court for

11  approval.  We do have a fiduciary duty to our creditors in

12  our case.

13               THE COURT:  Where are they in bankruptcy?

14               MS. SAWCZUK:  Here, Your Honor, in front of Judge

15  Katz.

16               THE COURT:  All right.

17               MR. LADDIN:  Good evening, Your Honor.  Daryl

18  Laddin on behalf of Verizon.

19               Your Honor, I am here before the Court because

20  Verizon is owed over five million dollars in postpetition

21  administrative expenses that remain unpaid, despite an order

22  that this Court previously entered in the case.  At the

23  outset of the case, Verizon entered into a stipulation under

24  Section 366 with the debtors that required semi-monthly

25  prepayments, and also gave Verizon the right to terminate

1   service on two business days notice in the event that

2   payments were not made.  The debtor failed to make those

3   payments on several occasions.  Verizon worked with the

4   debtors, continued to try to work with the debtors, the

5   debtors continued to fail to pay.  As a result of that, we

6   are now here being owed over five million dollars.

7           Your Honor, I am very concerned with the

8   procedural posture that we are in here.  In particular,

9   without reiterating what Mr. Gwynne had to say, I would like

10  to state that Verizon does join in the comments and objection

11  of MCI Worldcom.

12          In addition to that, Your Honor, we have

13  significant concerns about the due process with respect to

14  this particular sale.  As I understood Your Honor's comments

15  during the meeting with the debtors earlier, Your Honor had

16  denied the sale motion because there was no bidder.  The sale

17  that has just been discussed with the Court here is not the

18  subject of a motion.  It has never been noticed.  There is no

19  opportunity for any of the carriers, including Verizon, to

20  review the terms of the sale.  And it is not reasonable to

21  require any party in interest to review the terms of a

22  contract on what will amount to less than three hours notice

23  and be able to address all of the issues.

24          Substantively, I would expect quite a few

25  objections, including, in particular, the injunction that

1  apparently the purchaser is asking the Court to issue.  I

2  will acknowledge for the Court that there is a difference

3  between issuing an injunction against service providers based

4  upon the request of the FCC for the concerns of the FCC -- as

5  I understand, that was a significant reason why the Court

6  entered the initial injunction -- there is a significant

7  difference between that and issuing an injunction that

8  benefits the purchaser in this case as well as the banks,

9  particularly if they are going to request that that

10 injunction be issued if there are any unpaid administrative

11 expenses.  I would expect that issue to be raised tomorrow,

12 and we would expect that to the extent that they are seeking

13 to be paid -- excuse me, to receive service during any period

14 subsequent to tomorrow, that they pay all of the past due

15 administrative expenses that are owed.

16          THE COURT:  Just so the record is clear, we came

17 here for a sale hearing today.  I was informed by the debtor

18 there was no sale.  So I said procedurally what I was

19 prepared to do is deny their motion as moot but I would

20 reconsider if the debtor got to me any information that there

21 was somebody around the courtroom that wanted to make a

22 proposal.  And that's what happened.  So the procedural

23 status of the sale motion is that it's not denied, because

24 the offer of Mr. Jonas' company is still pending, and the

25 hearing is continued till tomorrow.

1          MR. LADDIN:  For the record, I would go ahead and

2   state my objection for the record on due process grounds

3   going forward with the hearing tomorrow.

4          THE COURT:  Okay.

5          MS. SILVERSTEIN:  Laurie Silverstein on behalf of

6   certain affiliates of SBC.

7          I would join in Mr. Gwynne's comments with

8   respect to the issuance of the TRO.  And I would also add

9   that I was in the courtroom at the last hearing, and it was

10  my understanding that the sale hearing and the TRO were being

11  put over until today, and I believed the hearing to be

12  adjourned and left with my client, only to find out

13  subsequently that a TRO was entered.  So we were here at the

14  time, but since the TRO was put over until today we left.  I

15  don't know what comments were made by the FCC.  I did not

16  receive any notice of the TRO hearing prior to being in

17  court.  And I also believe there are significant procedural

18  issues with respect to the entry of the TRO.

19         I also agree that there are procedural issues

20  with respect to going forward with the sale hearing on a

21  completely different as yet undocumented sale motion.

22         One salient point that I would like clarified,

23  because it has now come up twice during the discussions that

24  have happened, is that the buyer will be taking on the

25  going-forward obligations from the closing date.  That's what

1    I keep hearing.  I don't know when the closing date is going

2    to be.

3              THE COURT:  You will hear about that tomorrow.

4              MS. SILVERSTEIN:  That is a salient term.  If

5    they know, we would like to hear today, if it is different

6    than tomorrow.

7              THE COURT:  The hearing that was scheduled for

8    today is adjourned until 3:00 tomorrow, which includes the

9    sale and the temporary restraining order.  When I was told

10   there wasn't a sale, there was a discussion of how we would

11   have a hearing that would consider all the interests that

12   would be affected by a conversion to Chapter 7.  So I

13   adjourned the hearing on the basis of that information to

14   3:00 tomorrow by teleconference.

15             Then I was advised that there was the possibility

16   of a sale.  So all I have done is adjourned it to an open

17   hearing in the courtroom at 3:00 tomorrow, because it appears

18   we are not in a conversion mode, unless I am misunderstanding

19   something.  To get to that, in either instance, we had to

20   extend the TRO another 24 hours, until tomorrow.  But all

21   those issues about what is in the deal, I assume, will be in

22   the document and you can get it at 12:00 tomorrow.

23             MR. SHAPIRO:  The debtor agrees with Your Honor's

24   position.  It's clear that we came to Court hoping to come to

25   Court at some point today with a sale.  We didn't think we

1  had one this morning.  Now we may have one.  We are

2  continuing and adjourning the hearing until tomorrow and we

3  will find out tomorrow whether in fact we do.  And we will

4  address all the issues that people will be raising tomorrow

5  once they have an opportunity to see the contract.

6            THE COURT:  If there is no transaction to be

7  considered at 3:00 tomorrow, then we will go forward with the

8  premise that the teleconference was going to be, and that

9  would be to consider with the United States Trustee the

10 conversion.

11           MR. SHAPIRO:  I agree, Your Honor.

12           THE COURT:  Rather than be on a teleconference,

13 we will come here at 3:00 and consider that.

14           MR. SHAPIRO:  Hopefully Pauline Morgan has a lot

15 of space in her house tonight.

16           THE COURT:  We are going to -- unless somebody

17 has something that is different from what we have been

18 talking about...

19           MS. MELNIK:  Selinda Melnik for Lexend

20 (phonetic).

21           We had put on a motion for today on shortened

22 notice because of this hearing, and I was wondering whether

23 that would be put over not until tomorrow but to the omnibus

24 hearing on Thursday.  I wanted to clarify that.

25           THE COURT:  The only thing that was to be heard

1    today was the sale motion and a reconsideration of any

2    comments that folks wanted to make with regard to a TRO.

3    There was nothing else really on the agenda.  We are going to

4    move to tomorrow.  But anything else will be heard at a

5    to-be-scheduled omnibus hearing, because I am not sure what's

6    going to happen tomorrow that it would make any sense to have

7    an omnibus hearing on the 20th.  It's still possible this

8    case could go to Chapter 7 tomorrow.

9            MS. MELNIK:  I don't think that would moot our

10   motion, no.

11           THE COURT:  No.  But it would put it in a

12   different context.  And the Trustee, the reason why we

13   couldn't consider that information today is because the

14   United States Trustee has to find somebody to come in.

15           MS. MELNIK:  There may or may not be an omnibus

16   hearing on the 20th.

17           THE COURT:  There won't be for sure, because I

18   don't think -- Mr. Kenney, you can help us -- are you able --

19   I thought that was part of the stress of doing anything

20   today, because we have to get somebody to come in.

21           MR. KENNEY:  Your Honor, we do.  We might be able

22   to do it in a couple days.  But I know, if I get a trustee in

23   even this week, the trustee is not going to be able to

24   respond to Ms. Melnik's motion.

25           THE COURT:  So I don't think the 20th is going to

1   be a day that anything can be done.  So we are going to focus

2   on tomorrow and see what happens.  If it is a sale -- it

3   would be different than if it is converted.  And then if it

4   is converted, he will have to get somebody that can be --

5                MS. MELNIK:  So we will take one day at a time.

6                MR. JESSUP:  Douglas Jessup on behalf of Univance

7   (phonetic), Your Honor.  I flew out from Denver last Monday

8   coming for a sale.  I flew out again for a sale.  I will

9   probably stay overnight and wait for another sale.  I did

10  have last week set a motion for adequate assurance, Your

11  Honor.  Obviously, this is all moving very quickly, and we

12  did also have it set today.  I was one of the other motions

13  that was set today at 2:30.  I think we ought to roll that

14  over to tomorrow, if that is possible, Your Honor.

15               What I am faced with and what I have learned in

16  this whole process is the FCC came in and said we are going

17  to need 31 days to shut things down, and therefore, carriers,

18  you are going to have to go along with that, and we are all

19  scrambling to figure out who is going to pay for that and

20  things like that.  Now we have a new party who says they will

21  pay for things going forward, although I have not

22  heard -- they have left open when they get to terminate.

23  What I don't want to see is, they dance together for 45 days,

24  60 days, they say they are out of here and by the way send

25  their termination notice.  Now we are right back to where we

1    started again, 30 days, with nobody paying for it again.  It

2    has all kind of come to a head on this.  I bring that to your

3    attention, Your Honor, and also ask for my motion to be

4    continued.

5            THE COURT:  The motion was put on, again, the

6    agenda, without my agreement to hear those kind of matters

7    today.  You can present any kind of a position that you want

8    in response to whatever sale is proposed to be heard

9    tomorrow.  But again, if there is no sale tomorrow, then the

10   context is much different.  So I don't want to hear anything

11   in the nature of adequate assurance if there is going to be a

12   trustee appointed by the United States Trustee.

13           MR. JESSUP:  Agreed, Your Honor.

14           THE COURT:  Everybody here is sophisticated

15   enough to understand that there would have been a great

16   difference today if we continued with no buyer in a whole lot

17   of ways.  And we are still not sure that there is a buyer.

18           MR. JESSUP:  Your Honor, I feel the same way.

19   That is why we are trying to protect ourselves, trying to

20   understand what is going on.  I would also join in the other

21   comments of the carriers' counsel.  Thank you, Your Honor.

22           MR. SHERMAN:  Andrew Sherman, Seals Cummis, on

23   behalf of Qwest Corporation and Qwest Corporation

24   Communications.

25           We join in the comments by the other telecoms.

1        Your Honor, one point we would like some

2   clarification on is what contracts will the debtor be

3   assuming or will the purchaser be utilizing from the closing

4   date forward.  We still have yet to be supplied with a list

5   of contracts.  And if there is going to be this, quote,

6   management agreement, we need to know what business the

7   purchaser is going to manage, meaning what are the

8   contracts.  And if that list can be provided by tomorrow at

9   12:00, at least that might get some type of notice out to the

10   counter-parties to the contract of what --

11        THE COURT:  I don't think they are going to have

12   that tomorrow.  I think they contemplated, I will let Mr.

13   Shapiro a little bit -- when the presentation was made, my

14   understanding is that that was what they were going to do

15   between tomorrow and the presentation to the state and

16   federal regulatory authority.

17        MR. SHAPIRO:  Let me try to explain how I think

18   it would work.  This is again really the buyer's

19   transaction.  As I understand it, the buyer will not be

20   seeking to assume and assign any contracts tomorrow.  So the

21   debtor will continue to utilize let's say the transaction

22   actually closed after Your Honor entered an order tomorrow

23   immediately, so on Thursday, or Wednesday or Thursday, the

24   buyer will have bought the equipment.  Obviously, the

25   licenses won't be transferred, the customers won't be

1  transferred until subsequent regulatory approval by the FCC

2  and the appropriate states.

3          However, in the interim, as we have heard, the

4  buyer intends to operate the business and has said they will

5  continue to pay all the ongoing costs of operating the

6  business.  To the extent that the buyer continues to use the

7  services of Mr. Sherman's client, Qwest, then they would have

8  to pay on a current basis, on a go-forward basis from the

9  closing forward for those services.

10          THE COURT:  As I understood it, they were going

11  to escrow some funds.

12          MR. SHAPIRO:  They agreed to put 30 million

13  dollars in escrow to support their obligation to do so.  If,

14  however, three days into their ownership they decide to

15  terminate the Qwest relationship, then they would obviously

16  have to give Qwest notice and have to terminate and stop

17  paying --

18          THE COURT:  While that process was occurring,

19  they would be getting paid from the escrow funds.

20          MR. SHAPIRO:  Correct.

21          MR. SHERMAN:  We can address it tomorrow.  Who is

22  going to be the party to our contract subsequent to this?  Is

23  the debtor going to remain on the hook or is it going to be

24  the purchaser?  As the purchaser, there has to be a formal

25  assumption and assignment.  There has to be a cure.

1          THE COURT:  It sounds to me like they are both on

2     the hook, but the debtor has no money.  It's the purchaser,

3     and once they notice you, either for, it would be an

4     assignment, you will have an opportunity to come in and

5     object to that assignment.  And if they reject you, you have

6     an opportunity to come in, being paid till that point, and to

7     present your cure.

8          MR. SHERMAN:  I guess everybody can imagine what

9     will happen is they will not give that notice of assignment

10    for 60 days, allow the carriers to continue to provide

11    service, then on the 60th day or whatever they decide to

12    reject, again, you have sort of abdicated or pushed off the

13    rights the telecoms, including Qwest, has under 365.  We can

14    get into that tomorrow.

15         THE COURT:  Well, again, it would depend on the

16    agreement and what the time frames of the agreement are and

17    the amount of money and what determination I will make that

18    they have protected companies like your client.

19         MR. SHERMAN:  The last point, Your Honor, I guess

20    we will get into it tomorrow, it appears the debtors seem to

21    be transferring their rights under 366 to the purchaser.  In

22    essence, the carriers will be forced to begin anew under this

23    management arrangement, with no deposit or otherwise, and

24    again, we are going to be providing full services, I think

25    the management agreement had a five-day cure.  And again, we

1   will reserve those rights and more likely than not object to

2   that tomorrow.

3           THE COURT:  Well, what would happen to your

4   client if tomorrow I signed a conversion order and I continue

5   the injunction till I feel comfortable with the evidence that

6   I have relied on from the FCC that you not terminate?  How

7   long could you be pushed out then, with no money?

8           MR. SHERMAN:  As long as Your Honor continues the

9   injunction.  That is up to Your Honor's discretion, I

10  imagine.

11          THE COURT:  But assuming it's the 31 days, I am

12  not so sure you are in a better situation there.  That is

13  your best situation without a purchaser.

14          MR. SHERMAN:  That could be.

15          THE COURT:  How much would your client lose in 35

16  days?

17          MR. SHERMAN:  Over a million dollars.  A

18  million-five.  But at that point, we would know there would

19  be a finite date and that services would terminate if the

20  arrangement -- we can deal with it if in the sale continues.

21          THE COURT:  I guess my point is, I don't think

22  that that finite amount of money changes whether you get 60

23  days and get paid or whether you get it tomorrow.  That is

24  why I am having a hard time understanding the position.

25          MR. SHERMAN:  Well, first, we are not assured,

1   and I understand --

2   THE COURT:  You would like to get out of this

3   Winstar situation as quickly as possible, I understand that.

4   But absent that, I don't see your exposure shifting in any

5   way from that outside amount of money, based on what I know

6   from what I have heard from the FCC to date.

7   MR. SHERMAN:  We are continuing to provide

8   services, yes, you will have a guarantee of IDT, I guess

9   however they are going to phrase it, in the document.  But --

10  THE COURT:  I think it is more than a written

11  guarantee.  I think it is a cash guarantee.  They are going

12  to put money in the bank.  If that starts to run short, I

13  assume you can run back in here and tell me, Judge, there is

14  not enough money in there, we need more.  And I would tell

15  Mr. Jonas to ante up because things are taking longer, if you

16  want to stay in that game or your 31 days or 35 days would

17  kick in because I wouldn't enjoin you any longer.

18  But again, I don't see how the outside gets any

19  worse than five or six days for you.

20  MR. SHERMAN:  Maybe it's semantics or if it was

21  structured as a prepay, this 30 million dollars, you started

22  a prepay arrangement with the various carriers, that might

23  gives the carriers a little more comfort on a go-forward

24  basis.  Just to have the 30 million sit there in escrow and

25  you have to apply for it and be paid in arrears is different

1    than the arrangement we negotiated with the debtor --

2              THE COURT:  I understood it to be an ongoing

3    thing.  We will see tomorrow when they present the document.

4    But I think you got to focus on that potential of a 30- to

5    40-day loss is out there no matter, and what saves you from

6    that is a deal.

7              MR. SHERMAN:  That is one perspective and maybe

8    my client will disagree with that.  Maybe, as Your Honor

9    said, they want to get out of this situation.

10             THE COURT:  Because it is unsettled and I can

11   understand that.

12             MR. SHAPIRO:  Your Honor, I suggest we need to

13   resolve all these things in the contract.  We haven't reached

14   agreement on all these points.  We will reach agreement,

15   hopefully get a document.

16             THE COURT:  You are getting some information of

17   what could help you work through.

18             MR. SHAPIRO:  It is helpful to know people's

19   concerns.  We anticipated these concerns, and we will be

20   address them tomorrow.

21             THE COURT:  Anyone else want to be heard?

22             We will be in recess until 3:00 tomorrow.

23             (Hearing concluded at 7:05 p.m)

24                          - - -

25   Reporter:  Kevin Maurer

I hereby certify that there shorthand notes
are, to the best of my skill and ability, true
and accurate notes of the proceedings con-
tained therein.

Official Court Reporter
U. S. District Court