EXHIBIT I

1           IN THE UNITED STATES BANKRUPTCY COURT

2             IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    In re                    :      Case No.
                              :
5    WINSTAR COMMUNICATIONS,  :
     INC., et al.,            :
6                             :
                              :
7            Debtors.         :      No. 01-1430 (JJF)

8                          - - -

9

10                 Wilmington, Delaware
                Monday, December 17, 2001
11                     3:05 p.m.

12                          - - -

13

14
     BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.
15

16                          - - -

17

18

19

20

21

22

23

24

25

1850

1          (The following took place in chambers, Ms.

2   Morgan, Mr. Shapiro, Mr. Cobb, Mr. Karotkin, and Mr. Kenney

3   being present.)

4          THE COURT:  There is a hearing today scheduled

5   for a sale motion, and that was the only item that I had put

6   on the agenda.  As I understand it, there is no sale.  I have

7   asked counsel to come in and speak to me about the status of

8   this Chapter 11 and whether or not there still is no sale.

9   If counsel could put their appearances for the court reporter

10  on the record.

11         MR. SHAPIRO:  Mark Shapiro from Shearman &

12  Sterling for the debtors.

13         MS. MORGAN:  Pauline Morgan from Young Conaway

14  for the debtors.

15         MR. COBB:  Richard Cobb of Klett Rooney on behalf

16  of the debtor-in-possession lenders.

17         MR. KAROTKIN:  Steven Karotkin, Weil, Gotshal &

18  Manges, for the debtor-in-position lenders.

19         MR. KENNEY:  Mark Kenney for the United States

20  Trustee.

21         THE COURT:  Is it still correct that we have no

22  sale to rule upon?

23         MR. SHAPIRO:  Yes.

24         THE COURT:  I don't know how this fellow got in

25  chambers, but his name is Howard Jonas.

1            MR. KAROTKIN:  Can I respond to that, Howard

2    Jonas?

3            THE COURT:  Let me just put it on the record.  He

4    is from IDT Corporation, Newark, New Jersey, who presented a

5    card to my secretary saying he is a bidder.

6            Your turn.

7            MR. KAROTKIN:  IDT has kind of floated in and out

8    of this over the last three or four weeks with various

9    proposals, submitting proposals, withdrawing proposals.  As I

10   understand it, they submitted a proposal on Friday or

11   Saturday --

12           MR. SHAPIRO:  Friday afternoon.

13           MR. KAROTKIN:  -- pursuant to which they made an

14   offer to purchase some of the assets out of a Chapter 7.  The

15   people from Blackstone have been trying to understand what

16   they are proposing and exactly what they mean.  And right

17   before we came in here now, there were some discussions going

18   on with them to try to figure out whether a potential

19   transaction was possible.  I was involved in those

20   discussions.  I think that probably within ten or 15 minutes

21   there would be some more definiteness to whether or not that

22   was a potential.  But I don't want to overstate anything.

23           THE COURT:  All right.  I am going to take the

24   view presently -- of course, it could change, because I

25   assume they are still talking out there -- that there is a

1    motion for a sale but no sale pending for me to rule on.  So

2    the question is, scheduling going forward, what do I need to

3    schedule to move this case, either what was discussed at the

4    hearing that we continued to today, the possible conversion

5    to a Chapter 7, and what Court time would you need if that

6    was the application, or some other application.

7              MR. SHAPIRO:  I think where we are right now is

8    the bidder, the one bidder who was left said that they had

9    the money.  But of course we haven't seen it yet.  And of

10   course, as recently --

11             THE COURT:  I am beyond that.  I am saying there

12   is no sale.

13             MR. SHAPIRO:  Assuming there is no sale, I think

14   we have no choice but to convert the case.  We were there

15   last week and I think that's where we are now.  I think what

16   we have been talking to Mr. Kenney about is we tried to do

17   this, because it is a regulated company, in the absolutely

18   least disruptive way to everybody involved.  That is my goal,

19   to do something that will not harm people.  So I think it is

20   our view -- we have talked to the U.S. Trustee's Office about

21   it -- that we try to put into place a Chapter 7 trustee, have

22   a very, very shortened order for a hearing, a 341 meeting,

23   and put into place a permanent trustee very quickly so that

24   this whole 30-day migration program can be effectuated

25   quickly and in a way that is consistent with what the FCC is

1    interested in having and in a way that is consistent with

2    what the banks have been having.

3              I think he is amenable to that general concept.

4              MR. KENNEY:   Right.   I think what I get within

5    that concept, Your Honor, is because this is a regulated

6    company and because there are some significant governmental

7    interests involved here, we would want to make sure that the

8    order converting the case not only authorizes but directs the

9    trustee to operate the company to whatever extent is

10   necessary to avoid these disruptions.   I am not sure if we

11   can avoid all of the disruptions to all customers, but

12   certainly the federal and state agencies that are involved.

13             I had an inquiry from the district executive for

14   the Southern District of New York, who said their entire

15   system is on Winstar, and Verizon right now is not a viable

16   alternative for them because Verizon is still trying to

17   restore service to people after September 11.

18             MS. BAER (Court's Secretary):   There were

19   representatives from the Zimmerman Group that just knocked on

20   the door to let you know that they are here and that they

21   have an offer.

22             THE COURT:   So what I am hearing is that you

23   probably need to do some strategizing and paperwork, limited

24   paperwork, and, we had an omnibus hearing scheduled in this

25   case for --

1          MS. MORGAN:  The 20th.

2          MR. COBB:  Thursday.

3          THE COURT:  What time was it?

4          MS. MORGAN:  3:30, I think.

5          THE COURT:  Would you want to use that date or

6  have me give you a date next week, where you could come back

7  with whatever you didn't get in interim relief today?

8          MR. SHAPIRO:  One of the questions is whether we

9  can do it more quickly.  I think everyone is very concerned

10  that if we keep going we could --

11          THE COURT:  Quicker than the 20th, sure.  I want

12  to be available to help you get through this.

13          MR. SHAPIRO:  Our thought was to try to construct

14  an order that is consistent with what we just talked about,

15  that is consistent with ultimately making sure that the

16  system stays up for 30 days.  The banks and the carriers have

17  not yet reached agreement on how that will work.  The banks

18  are agreeing to allow some use of cash collateral to keep

19  this going.  The carriers want to be paid in full.  And you

20  have a negotiation that is currently ongoing between how much

21  they should get and how much the banks are willing to let

22  them have.  That hasn't been concluded.  I think if we can

23  have some out date by which everyone has got to reach an

24  agreement, put pressure on everyone to reach a deal, that

25  will be very helpful to us, if we could say we are converting

1  the case, and subject to working out an acceptable order in

2  the next 24 hours, and we will come back to Your Honor with

3  an order, hopefully that is consensual, with the U.S.

4  Trustee, the banks, and the FCC.

5            THE COURT:  So let's assume that I say 24 hours,

6  would you want me to schedule a hearing, if it is not

7  consensual, for tomorrow afternoon?

8            MR. SHAPIRO:  Yes, I think that would make sense,

9  if you had the time.

10           MR. KAROTKIN:  I think that is fine.

11           THE COURT:  A hearing on an intended motion to

12  convert.

13           MR. KAROTKIN:  I think that is fine.  I think we

14  had made progress with the FCC, and I am hopeful -- with the

15  FCC and with the carriers, and I am hopeful we can reach an

16  understanding.  I think to the extent that everyone has some

17  certainty, knowing there are no certainties in the world,

18  that the 30-day period is a 30-day period because there is a

19  limited amount of money here and everyone has to work really

20  hard to make sure it works, that is fine.  I would only ask

21  if we could impose upon the Court to participate by

22  telephone, it would make our lives really easy.

23           THE COURT:  We could actually do the whole thing

24  on telephone if someone initiates the call and you all line

25  up who you want on it, and we will do it by telephone.

1          MR. SHAPIRO:  We can set up a call-in number.

2          THE COURT:  Sure.

3          MR. SHAPIRO:  The other issue that we have is we

4    also have a bunch of -- your TRO that you issued on last

5    Monday will run out today.  I don't know if you want to

6    extend that, because we need 24 more hours to work this out.

7    Hopefully, no one will terminate us, but it makes sense to

8    extend it to the telephonic hearing.

9          THE COURT:  I will just enter an order that

10   continues it until tomorrow to whatever time we set the

11   hearing for.  Now, there will be some folks that won't

12   appreciate that, but probably nobody that is integral to what

13   you are trying to work out.  They will be involved in trying

14   to work it out.

15         MR. KAROTKIN:  I think that's right.  I think

16   most of the people we were on the phone with today.

17         MR. SHAPIRO:  We spent the weekend trying to work

18   this out.  It is not quite done, but I think, as Steve

19   characterized it, it's close.

20         MR. KAROTKIN:  If anything materializes with

21   these IDT people, are you available this afternoon?

22         THE COURT:  Yes.

23         MR. KAROTKIN:  I think people would like to stay

24   here to see if something could be worked out and if possible

25   come back before Your Honor.

1           MR. KENNEY:  Is Zimmerman one of the people who

2  was bidding?

3           MR. KAROTKIN:  He was here last week.

4           MR. KENNEY:  He never came up with anything.

5           MR. SHAPIRO:  He says he is here with his money.

6           THE COURT:  If you want to do the phone

7  conference at 2:00 tomorrow, we will enter an order extending

8  the TRO that was entered last Monday, and then we will take

9  off the hearing on the 20th, and then I will be here if

10  something develops with a potential buyer.

11           MR. KAROTKIN:  Great.  Thank you.

12           MR. KENNEY:  Your Honor, I have another

13  engagement that probably will not be over by 2:00.  If I

14  don't have all of my issues resolved with the debtors, I will

15  arrange for somebody from my office.

16           THE COURT:  We can move it.  When will you be

17  available.  3?

18           MR. KENNEY:  3 would work better.

19           THE COURT:  We will make it 3 tomorrow.

20           MR. SHAPIRO:  Just so Your Honor knows, we did

21  spend, to update you beyond my letter, we did spend all day

22  Friday with the Zimmerman folks trying to work out the

23  contract because we still hadn't finished with them on the

24  contract.  We weren't able to resolve -- there were about

25  half a dozen pretty significant issues that still could not

1    be agreed to between the debtors, the DIP lenders, and the

2    potential buyer.  And we said, look, you know, we are not

3    going to spend the whole weekend negotiating with you guys

4    when you are not telling us there is money.

5           I asked on Friday, can you provide me with at

6    least evidence that the money will be there on Monday.  Give

7    me something that tells me that we should continue this,

8    because this is becoming ridiculous and we have 25 people

9    working away on this in different places.  The best he could

10   tell me was that they were working with three bridge lenders

11   on a term sheet.  He didn't want to give it to me.

12          Frankly, a term sheet from a bridge lender for

13   the 15 million dollars wasn't particularly useful.  That is

14   where we ended up on Friday afternoon.  Over the weekend, I

15   called Susheel Kirpalani, their counsel at Milbank, a number

16   of times.  I exchanged a couple of voice mails.  And he had

17   nothing to report to me over the weekend in terms of ability

18   of his client to raise the funds.  The last I heard, they may

19   have been trying to get moneys wired from some third party

20   into a Wintel, which is the buyer's name, account somewhere,

21   and that in turn, Wintel, once it receives those funds from

22   wherever they are coming, would wire those funds to

23   Shearman & Sterling.

24          I asked them, when would that happen.  They

25   couldn't answer that.  I said, what about the rest of the

1    money?  15 is just a deposit, and you need a lot more money

2    to operate this company and close the deal.  And he had no

3    response.

4              THE COURT:  The kind of buyer you are looking for

5    may have a problem, I would think, may have some problem with

6    terms, but wouldn't be shallow on that 15 million.

7              MR. KAROTKIN:  The concern that we have is that

8    you have someone who has consistently said they are going to

9    put up money.  And let's say they do come up with some money

10   and you enter into a transaction which can't close for

11   another 30 days, where they are going to need more money, and

12   another 90 days where they are going to need more money, the

13   risk that doesn't show up, we are in a much worse situation

14   than we are in today.  That is a big concern of ours, and

15   ought to be of the FCC as well.

16             THE COURT:  Again, the kind of buyer that you are

17   looking for and need, that third-level money may not be tied

18   down, but the first and part of the second level would not be

19   a problem for them.  And it sounds like what they are doing

20   is hustling your conversation to try and get somebody to put

21   up some money.  The conversation isn't being seen by the

22   people that they are trying to get the money from as

23   something they want to invest in.

24             People with money, they drive deals.  If they are

25   not buying the hype -- you all see that every day.  There is

1    probably someone out there that had the money that they were

2    talking to but they are just not liking what they have to do

3    to make this deal.

4         MR. SHAPIRO:  This is the only one that actually

5    got a DIP.  The reason it did is everyone believed it could

6    be reorganized or sold.

7         THE COURT:  That was the big thing they were

8    talking about in the Journal.

9         MR. KAROTKIN:  The first and last DIP.

10        MR. KENNEY:  Maybe the Journal writer knows where

11   the money is.

12        THE COURT:  Actually, the numbers aren't that bad

13   for what you would get if you knew how to operate it.  If you

14   had some foresight that you could actually make it work, this

15   is like salvage.  It's not that bad.  But I guess, who is out

16   there to operate it?  The first round couldn't do it.  There

17   won't be many lenders coming in on these.

18        MR. KAROTKIN:  There aren't many DIPS that don't

19   get paid.  First of all, there are not many DIPS that don't

20   get paid in full and hardly any that are going to get 20

21   cents on the dollar or whatever, maybe 30 cents.

22        THE COURT:  DIPs don't lose money.  But there is

23   risk.

24        MR. KAROTKIN:  We know that now.

25        MR. KENNEY:  This is the case that proves the

1  rule.

2          THE COURT:  This proves the rule.  The worst part

3  of this case, you took forced financing for a week, too,

4  which will make DIPS wonder.

5          Well, okay.  I will be around if something

6  breaks.  I think you could tell those folks I will be real

7  focused on dollars today, and I think the three or four

8  levels they need dollars, not just today.  And absent that,

9  all those other folks out there, their problems are going to

10  be dealt with by a trustee.  There is nothing I can tell

11  them.  Mr. Kenney is going to work to get us something here.

12          MR. KENNEY:  We will try to get a trustee in real

13  quick.  One of the things Mr. Shapiro points out was the need

14  to, we will have a trustee with the authority and directive

15  to operate the company, but the reality is the learning curve

16  is going to be very steep.  And I think it's a given at this

17  point that at the 341 meeting the creditors will elect their

18  own trustee to replace the interim trustee.  So I think what

19  they want to do is accelerate the process.  And we had some

20  discussion about that, Rule 2002 says it is a 20-day notice

21  and it kind of falls into a twilight zone of whether the

22  Court can shorten that period.  I am going to let them do the

23  selling job on that and not take a position.

24          MS. MORGAN:  Your Honor, I don't think it is a

25  twilight zone.  I think 9006 says reduction is permitted in

1    certain circumstances.  It cites the rules under which

2    reduction is not permitted.  And the scheduling of a 20-day

3    notice of a 341 is not listed there.  That means reduction is

4    permitted.  I think we would ask the Court for a motion to

5    shorten that period so that that 341 meeting could be held in

6    about a week's time.  We would publish it on our website.  We

7    haven't thought about how else we could publish it.

8                    MR. SHAPIRO:  Put out a press release.

9                    MS. MORGAN:  Yes, to give people notice so they

10   could elect a trustee promptly.

11                   MR. KENNEY:  We would ask for those kind of

12   safeguards.

13                   THE COURT:  Those safeguards and take no

14   position -- right, which will work.

15                   MR. SHAPIRO:  We can build that all into the

16   order.

17                   MS. MORGAN:  If I may clarify.  There are a

18   couple agreements that we have in place, for instance,

19   assumptions and assignments with consent, there is one that I

20   have here with me today that would result in, for instance, a

21   waiver of a large administrative claim.  To the extent we can

22   get those approved, can we just submit those if they are

23   consensual?

24                   THE COURT:  Anything that is consensual, just

25   send over, we will get them signed and stop the clock, or

1    avoid a claim, if we can.  If they are consensual, no one

2    cares.

3             MS. MORGAN:  As far as the motion to convert, is

4    the U.S. Trustee's motion --

5             MR. KENNEY:  We will move orally.

6             MS. MORGAN:  And we will file the motion to

7    shorten then.

8             MR. SHAPIRO:  We will prepare a consensual order.

9             MR. KAROTKIN:  I just have one question.  I

10   assume when we go outside Mr. Zimmerman is going to say, you

11   know, I have a bid to make, I want to make a bid --

12            THE COURT:  This isn't an option, that's what you

13   tell him.

14            MR. KAROTKIN:  I assume at this point a

15   determination of whether to consider these things rests with

16   the debtor and the creditors.

17            THE COURT:  The Judge doesn't get involved in

18   deciding whether he is -- doesn't take bids and doesn't

19   decide whether, you know, they are of some value to the

20   estate.

21            He has to sell the debtor.  But the motion that

22   was pending is now denied as moot.

23            Now, the debtor can get to reopen that motion,

24   what do they call it, reconsider, I mean that ruling, that it

25   is denied as moot, but he has to, I assume the debtor would

1    have to be convinced that there was some reason to move

2    that.  Somebody out there in the world who wanted to be in

3    the game can't come in and do that.

4              Does anybody disagree with that?

5              MR. KAROTKIN:  No.

6              MR. SHAPIRO:  No.

7              THE COURT:  I told Ms. Morgan when I was worried

8    about scheduling or concerned about scheduling that unless

9    there was some premise to the sale motion, that the hearing

10   was canceled, because that's what I had before me, a sale

11   motion.  And that's what I did.

12             Now I am going to deny the motion on the record

13   as moot, and you can move for me to reconsider that ruling on

14   some basis.  But there is nothing there now.  He should be

15   talking to the debtor and to you.

16             MR. KAROTKIN:  Okay.  Thank you.

17             THE COURT:  Our friend from the Trustee's Office,

18   whose motion to convert is just hours away from being

19   considered and ruled on.

20             MR. SHAPIRO:  The TRO --

21             THE COURT:  I will do that on my own, based on

22   the conversation we had here that you need time -- why I got

23   you in here was scheduling and what was going to, you know,

24   be your idea about going forward.  And based on what you told

25   me, I will extend that for 24 hours, to our 3:00 hearing

1  tomorrow, with the understanding, as I hope I said before,

2  that all the parties subject to that restraining order are

3  working with you to reach something consensual so they are

4  not being in any way unduly prejudiced.  If they can't agree

5  with you, we will hear them tomorrow at 3:00.  But that's

6  unlikely.  I would hope it's unlikely.  Hopefully, they are

7  going to work to make this a smooth landing -- there is no

8  smooth landing here -- but so that no one has to suffer a

9  fatality, is the hope.

10           MR. KAROTKIN:  Can we go off the record a

11  minute?

12           THE COURT:  Sure.

13           (Discussion off the record.)

14           MS. MORGAN:  I guess those people want to hear

15  what is happening and we are telling them what is happening.

16           THE COURT:  It is over.  There is no sale.  There

17  is nothing to do.  Right?

18           (Conference in chambers adjourned.)

19           (The following took place in open court, at

20  approximately 5:50 p.m.).

21           THE COURT:  Proceed, please.

22           MR. SHAPIRO:  Good afternoon, Your Honor.  Mark

23  Shapiro from Shearman & Sterling for Winstar Communications,

24  debtors.

25           Your Honor, after our chambers conference earlier

1   this afternoon, during that chambers conference, a party

2   named IDT Corporation, who had been a party that the debtors

3   had been having on-and-off discussions with through the

4   entire auction process but whom debtors could not reach

5   agreement with, made an offer to the financial advisors to

6   the debtor, Blackstone.  Since that time we have worked to

7   try to flesh out all the terms of that offer.

8        I think we have what I will call the principle

9   points agreed to in principle but not in writing.  And what

10  we would like to do is have the attorney for IDT Corporation

11  present those to the Court so that the Court understands

12  their offer.  We would work this evening to try to finish a

13  contract with them and come back at 3:00 tomorrow to see

14  whether in fact we have a deal, and if we don't have a deal

15  or it is not an agreed upon deal that we have a meeting of

16  the minds on, then we would go back to the plan we discussed

17  with Your Honor in chambers earlier today.

18        We believe that this deal, if we could consummate

19  this deal, would be beneficial to the estate, would

20  potentially be beneficial to some of the employees, and would

21  allow, certainly allow an orderly transition period for

22  customers.

23        With that, I would like to have David Albalah,

24  counsel for IDT, present to the Court the details of their

25  offer.  We will supplement that to the extent it differs from

1    our understanding.   And then what I would propose we do is

2    adjourn to the offices of Young Conaway to see whether we can

3    work out between now and 3:00 p.m. a contract and management

4    agreement and order that we would present tomorrow at 3:00

5    p.m. in court.

6                    THE COURT:   All right.

7                    MR. HARRINGTON:   Good afternoon, Your Honor.

8    William Harrington, Duane Morris & Heckscher.   I would like

9    to move the admission of David Albalah.   His pro hac motion

10   was previously filed with the Court electronically but has

11   not been signed yet.

12                   THE COURT:   I will grant the application.

13                   MR. ALBALAH:   Thank you, Your Honor.   Good

14   afternoon, Your Honor.   Thank you for your patience.   David

15   Albalah from McDermott, Will & Emery on behalf of IDT

16   Corporation.

17                   As counsel for the debtor just communicated, we

18   have spent a fair amount of time today, and I do believe we

19   have an agreement in principle.   What I will do is go through

20   the salient points.   At the conclusion thereof, I will ask

21   Your Honor to so order the record.

22                   The transaction is as follows --

23                   THE COURT:   Let me understand something.   When

24   you suggested I would so order the record, my understanding

25   is that, and because of the history here, that I would listen

1    to this proposed offer, and then, because it would be

2    something that no one had notice of, we would have the record

3    on this offer closed, come back tomorrow at the hearing we

4    thought we were going to have today, and it would be in

5    court.  We were going to have a telephonic hearing about a

6    conversion.  But we would come back tomorrow, and then I

7    would listen to anybody that wanted to be heard on this

8    proposed transaction, and then at that point I would consider

9    approving this transaction.  Otherwise, nobody else had

10    notice of what you are going to tell me, and I am hearing it

11    for the first time.

12            Mr. Shapiro, is that what you were thinking?

13            MR. SHAPIRO:  Yes.  I am not sure what Mr.

14    Albalah meant by being so ordered.  I think this is just an

15    explanation to the Court of what is to come for tomorrow.

16    Tomorrow's hearing would be a presentation of the contract

17    and the order.  Yes, I agree with Your Honor's remarks.

18            MR. ALBALAH:  Part of the concern, Your Honor --

19    I don't want to dwell on it now, I think we should go through

20    the points and circle back to this.  Part of the concern, and

21    I want to consult with my client, is whether the debtor is

22    shopping this thing.  We haven't discussed the breakup fee or

23    anything along those lines.  So we expect this to be the

24    deal.  We will circle back with Your Honor, with Your Honor's

25    permission, to get comfort in that regard.

1          The transaction would be as follows.

2          IDT Corporation or its designee would purchase

3    all of the assets, free and clear of all liens, claims,

4    interests, and encumbrances, except for specifically

5    delineated assets.  And I will tell you what they are.  The

6    purchase price will be 38 million dollars cash or 30 million

7    dollars cash plus Class B IDT common stock in the value of

8    12.5 million, measured based upon the last seven trading days

9    from today.

10          If IDT does not get a registration within 60

11   days, then the debtor would be able to put that stock

12   interest on IDT for ten million dollars cash.  So either it's

13   38 million dollars cash, or 30 million dollars cash plus 12.5

14   million dollars in stock, or 40 million dollars cash.

15          MR. JONAS:  I think that is the choice.

16          MR. ALBALAH:  The debtor will elect as to whether

17   it wants the cash option or the cash and stock option.  It is

18   at the debtors' election.  All or nothing.

19          The excluded assets are Lucent litigation,

20   Office.com, Aon Put, Wamnet (phonetic) Debt & Equity,

21   RadioNote, TVVideo Note, avoidance actions, D&O claims, any

22   prepaid workers' compensation, tax refunds, if any, cash as

23   distinguished from accounts receivables, claims against

24   Savis, I believe that's S-a-v-i-s, claims against Velocita,

25   V-e-l-o-c-i-t-a, PSINet Hong Kong, excluded subs, that's

1    it -- the above net claims, correct.

2              Those are the excluded assets.  Everything else

3    is to be purchased, and again free and clear of all liens,

4    claims, interests and encumbrances.  And we will have an

5    order obviously that I will comment on.

6              The debtor -- I am going through this in no

7    particular order.

8              The debtor intended to notice termination to

9    customers.  The debtor will not do that.  My client will have

10   the right to determine the timing of the sending of that

11   notice.  My client will be obligated to fund costs going

12   forward for the transition period pending regulatory, FCC and

13   state regulatory approvals.

14             The only exception to the concept of my client

15   controlling when the notice is circulated, if at all, is to

16   the extent that there is any Hart-Scott requirement.  If

17   there is a Hart-Scott requirement, and we determine that

18   there is a Hart-Scott requirement, then the notices will go

19   out Thursday.

20             There would be in the order, and in appropriate

21   other documents, clarity with respect to no employee

22   liability whatsoever.  My client, in addition to the general

23   free and clear, assumes no liabilities with respect to

24   employees of any kind or nature.

25             There is no out for regulatory consents.  If the

1    FCC, if the state regulatory authorities, do not consent to

2    the transaction for any reason, there is no out.

3         To the extent that the licenses have any value

4    and proceeds are realized, that would be part of the assets

5    purchased.

6         The parties contemplate that this Court would

7    issue an order similar to the order that I understand is in

8    effect, compelling service providers of all nature and kind,

9    including telecom companies, landlords, et cetera, to

10   continue providing services during the transition period.

11   But my client will pay all those services.  My client may

12   negotiate discounts, may negotiate terms, but there is a

13   guarantee for the payment of that money.

14        In addition to the purchase price, there is a

15   five-percent interest that the estate would get in an entity

16   to be formed by my client.  That five percent the estate

17   would share, as, when, and if my client gets back its

18   investment in an unknown amount at this point in time.  We

19   know what we are making in terms of, in other words, cash and

20   stock.  We can quantify that.  We can't quantify the costs

21   that my client will pay to keep this alive.  As, when, and if

22   all of those costs come back, then the estate will have a

23   five-percent interest in the upside.

24        It is my understanding that the contemplation is

25   that the case may convert from 11 to 7.  We would have

1    assurances that this agreement is binding upon the Chapter 7

2    trustee and the estate.

3              It's an as is, where is acquisition, with no reps

4    and warranties.

5              My client has not yet determined the extent to

6    which it intends to seek approval and assignment of executory

7    contracts and nonresidential real property leases.  To the

8    extent it does not, it is the understanding of the parties

9    that the estate will have the burden, financial or otherwise,

10   to physically deliver the assets that my client is buying.

11   So, for instance, if there is a landlord with a lease that is

12   not assumed and assigned, and the landlord has a piece of

13   equipment on the premises, we are buying that equipment free

14   and clear.  And the order, as the parties contemplate it,

15   would provide protection to my client that it can get that

16   equipment.

17             If I didn't mention the time period, in terms of

18   the continuing order of Your Honor keeping the going-forward

19   service providers providing services, it's the parties'

20   understanding that that order would provide the time period

21   of the next 60 days.

22             Both parties will work diligently starting

23   immediately at the conclusion of this hearing to paper the

24   transaction.  In addition, the estate will cooperate and use

25   its best efforts to assist the buyer in terms of getting

1   regulatory approvals and the like.

2          My firm is holding 15 million dollars cash in an

3   escrow account.  I will work with debtors' counsel to work

4   out an escrow agreement.  Upon conclusion and the

5   satisfactory manner of that, we will forward that money to

6   the estate's counsel.

7          We are going to work on a management agreement,

8   which I won't burden the record with, that is necessary for

9   regulatory reasons and the like.

10         (Pause.)

11         MR. ALBALAH:  Thank you, Your Honor.

12         The 30 million dollars to cover -- as I said, the

13  buyer will be responsible for the ongoing expenses of the

14  business.  There will be 30 million dollars regarding that

15  that we will put in escrow.  That doesn't mean it will cost

16  30 million.  It may cost less or more.  We are going to put

17  30 million dollars in escrow.  And I neglected to mention

18  that earlier.

19         The purchase price, whatever form it comes in,

20  cash or stock, cash, or cash and stock, will be paid at

21  closing in an irrevocable manner.

22         I think I used the word guarantee in terms of the

23  estate delivering the assets.  And if there is a piece of

24  equipment, and the landlord doesn't want it, guarantee is the

25  wrong word.  It is the intent they will get all those

1  assets.  If there is a cost in terms of physically removing

2  it, the buyer would pay those costs.

3          Your Honor, if I may, Howard Jonas, the chairman

4  of the company, chairman of the board of IDT, is here.  May

5  he address Your Honor very briefly?

6          THE COURT:  Sure.

7          MR. JONAS:  Thank you.

8          I, fortunately, have never been in court before.

9          I think this is a very good deal for the public,

10 because I think there is a need for competitive telephone

11 service.  And in our diligence on the company, we found an

12 Intelligent, which is a company that we previously controlled

13 and made an offer for, even though unfortunately it wasn't

14 accepted at the time, and the business went down the hill,

15 but the business was not put together properly.

16         We do over a billion and a half dollars in

17 telecom business a year.  We are noticing a technical

18 infrastructure and a business infrastructure so poorly

19 operated.  It is our hope -- what we are planning to do is

20 one of two things.  We will probably have to terminate a lot

21 of the clients who are on net now, but we will be giving them

22 sufficient time to get out so they can get other services.

23 We are hoping a lot of the other services, like long-distance

24 services and data services and so forth from our company, it

25 is our intent to restart the business in the proper way with

1  the proper knocks in the proper cities, so we can provide the

2  service to the public, and hopefully there will be a number

3  of clients that we will be able to keep on who are already

4  on.

5          So I think approving this order serves the dual

6  purpose of, I can't say that the creditors are made whole

7  because they are six billion dollars in the hole, but it does

8  get them money, it does see that the public is not left

9  without telephone service for a long time, and somebody is

10  not forced to pay for it who doesn't want to be a creditor

11  anymore, and it does give a reasonable chance that we will be

12  able to continue operating these kind of services into the

13  future.

14          The last thing is our company has over a billion

15  dollars in cash, over a billion dollars in paid-up assets.

16  We turn a profit of close to a hundred million dollars a

17  year.  We have zero debt.  We will easily be able to carry

18  through and finance this acquisition and see that all the

19  commitments that our counsel made are in fact complied with.

20          I hope this doesn't have to go on to tomorrow.

21  You can order it tonight.

22          But that's all I want to say, thank you.

23          THE COURT:  Thank you, Mr. Jonas.

24          MR. SHAPIRO:  Mr. Albalah also wanted me to put

25  on the record that they will have the ability to speak with

1  management and have input to speak with management tomorrow

2  morning, which we agreed to.

3          I think, notwithstanding the fact that all, I

4  will call it, the salient points have been put on the record,

5  obviously, until we have a contract that is agreed to and

6  signed by the buyer and debtor, there is no agreement.  So

7  what we would try to do is between now and 3:00 p.m. tomorrow

8  complete a contract.  We have actually already worked on

9  contracts, obviously, with them and other people, so we have

10 a basic form of contract that we will work on tonight, see

11 whether we can reach an agreement, and be back here tomorrow

12 to see whether we can get it approved.

13         THE COURT:  All right.  Mr. Kenney, did you have

14 anything you wanted to add?

15         MR. KENNEY:  I think, Your Honor, what we have

16 heard is good.  I am obviously going to have to wait and see

17 what develops between now and 3:00 p.m. tomorrow, at which

18 point I would make any comments I have and anyone else would

19 have the opportunity to do so then.

20         THE COURT:  When would you anticipate, Mr.

21 Shapiro and Mr. Kenney, because I want you to review any

22 proposed agreement, that that would be available for people

23 to review?  We are going to come at 3.  I would like to have

24 a little time.

25         MR. SHAPIRO:  In fairness to everyone, I would

1   think by 12:00 tomorrow we need to have a contract

2   available.  We will send Your Honor whatever we have or

3   inform the Court we don't have an agreement.  But I think at

4   that point anyone who would like a copy ought to get in touch

5   with Pauline Morgan at Young Conaway, get her e-mail address,

6   so we have it in e-mailable form so we will e-mail it to

7   people starting at noon tomorrow.

8            THE COURT:  So we have the principles of

9   agreement.  And you are going to work to get it to a document

10  by noon tomorrow, so that it is available for purposes of the

11  3:00 hearing.

12           MR. SHAPIRO:  As well as the form of order we

13  would ask Your Honor to sign.

14           THE COURT:  The proposed form of order.  Mr.

15  Kenney?

16           MR. KENNEY:  That is fine, Your Honor.

17           MS. NEWELL:  Hello, Your Honor.  Margaret Newell

18  from the Department of Justice on behalf of the FCC and the

19  GSA.

20           Obviously, my comments about the order can wait

21  for tomorrow.  But I wanted to clarify, there is a hearing

22  scheduled tomorrow at 3:00 before Your Honor, but given the

23  fluidity of events today, there wouldn't be a hearing before

24  that time, would there?

25           THE COURT:  No.  Before 3:00 tomorrow on this

1  matter, no.

2              MS. NEWELL:  Thank you, Your Honor.  Just

3  checking.

4              THE COURT:  Okay.  The only thing that I am going

5  to do between now and 3:00 tomorrow is, or I have already

6  done it, I have extended the temporary restraining order that

7  was entered last week till 5:00 p.m. tomorrow, so that we

8  would have an opportunity, in the first instance, to proceed

9  to a conversion, but now to proceed to consider this

10 agreement.

11             So that's the only thing I am going to do between

12 now and tomorrow at 3:00.

13             All right.

14             MR. GWYNNE:  Your Honor, Kurt Gwynne on behalf of

15 MCI Worldcom.

16             I understand Your Honor is continuing the TRO.

17 Notwithstanding that, may I be heard on that issue, Your

18 Honor, just to create a record?  I have talked with my client

19 about the potential -- well, I have put in a call to the

20 client about the potential for appealing that.  The client is

21 on a flight to Chicago.  I would like to make a few

22 statements for the record.

23             THE COURT:  Sure.

24             MR. GWYNNE:  Thank you.  First of all, Your

25 Honor, as I think Your Honor knows, I have a tremendous

1  amount of respect for this Court and am proud to be a member

2  of the Bar of the District Court for the District of

3  Delaware.

4            THE COURT:  You must really want something.

5            MR. GWYNNE:  Your Honor, I have significant

6  concerns about the manner in which the original TRO was

7  entered and the manner in which the TRO was continued today.

8  Under Rule 65, it is clear that in order for a TRO to be

9  issued ex parte, counsel is supposed to exercise, quote, all

10 reasonable efforts, close quote, to notify opposing counsel.

11           Although I had called and left messages for

12 debtors' counsel the night before, just curious about the

13 sale process, I was never told about any TRO process.  And in

14 fact, when the motion was filed, although it wasn't filed

15 until 12 or 18 minutes before the hearing, it obviously was

16 prepared sometime during the day, as it was five or six

17 pages, had a four-page affidavit.  No telephone call was ever

18 made to me.

19           I think with respect to that, Your Honor, that

20 TRO was improperly granted for that reason, should not have

21 been issued ex parte.  And also, it is my understanding,

22 since I was not at that hearing, that the TRO did not even

23 issue at the hearing but issued as a result of a conference

24 in chambers.

25           We filed --

1          THE COURT:  I think, actually, it issued at the

2    end of a Court hearing, when I asked Shearman & Sterling to

3    present it predicated on the argument of the FCC.

4          MR. GWYNNE:  Your Honor, again, without

5    sufficient notice, I am not really sure what happened, unless

6    and until we obtain a transcript.  Then when the hearing was

7    scheduled for today, we filed an objection, which I don't

8    know if Your Honor had time to read it.  I realize it was on

9    file only two hours before.  But today, we understood that

10   the carriers, many of which are here today, were coming to

11   Court and would have the opportunity to have some discussions

12   with Your Honor about the TRO and/or the sale or winddown

13   process and what, if anything, the carriers were willing to

14   do.

15          Debtors' counsel came out of chambers and advised

16   us that the TRO was going to be continued.

17          Your Honor, I think, respectfully, with the

18   carriers being here in court, and debtors' counsel knowing we

19   were in court, I don't know if Your Honor knew, we should

20   have had an opportunity for a hearing, which hearing should

21   have been an evidentiary hearing, on whether or not the TRO

22   should have continued till tomorrow.

23          Debtors owe, under our original adequate

24   assurance agreement, 13.9 million to Worldcom.  Under the

25   modification agreement, where we made significant concessions

1   with the debtor, it is not scheduled to be heard until the

2   20th, the debtors would only owe approximately 2.9 million,

3   still a significant amount owed under the adequate assurance

4   stip as modified by what I call the modification agreement.

5           Under the adequate assurance, which was a

6   stipulation and order, we have the right to terminate based

7   upon certain postpetition defaults.  Not only was that an

8   agreement of the parties, but it was an order of this Court,

9   which no one has filed a motion to vacate, to modify, nor do

10  we think that that obviously would be the appropriate relief.

11          There is no adversary proceeding here, Your

12  Honor.  We have a TRO that has been issued based upon a

13  motion for a TRO and now a motion for a preliminary

14  injunction.

15          Injunctive relief requires an adversary

16  proceeding under Rule 7001, Subsection 7. And in In Re

17  Connectus, Your Honor held that a hearing was enjoined base

18  upon an oral motion before Judge Walrath that a lack of a

19  required adversary proceeding was a basis alone to deny the

20  request for injunctive relief.

21          THE COURT:  Are you of the view that, for

22  instance, your client could terminate service tonight absent

23  that temporary restraining order?

24          MR. GWYNNE:  No, Your Honor.  We have a two-day

25  notice period under our contract with the debtor and we have

1    never sent a termination notice, to this day, we haven't.

2    And we were surprised to be included in the ex parte motion,

3    when we hadn't even issued a termination notice.

4            THE COURT:  But you could do it within 48 hours.

5            MR. GWYNNE:  I believe, Your Honor, under our

6    adequate assurance stipulation, which specifically provides

7    we can terminate in I think it's two business days or 48

8    hours notice, yes, we can.

9            Now, I understand the FCC has raised some issues

10   about termination periods and notice.  Under Section 214 of

11   the Telecommunications Act, the debtor has a duty to give

12   notice to its end users.  We are not providing service to the

13   end users.  This is carrier-to-carrier service.  There is no

14   requirement that we give any period of notice to the debtors

15   unless it's required by some applicable tariff or contract or

16   what have you.

17           So we do believe that we could terminate in two

18   business days notice.  In fact, Your Honor, we have done that

19   in many other cases where there have been defaults, and other

20   cases that have sort of headed south the way this one has.  I

21   do believe we could.  I am not asking Your Honor to give us a

22   right we don't have.

23           THE COURT:  I am just trying to understand,

24   because the FCC takes a different view.  And what I could do

25   is I could schedule a hearing to give you an opportunity to

1    be heard against the FCC's issues and in the meantime leave

2    the order in place, and we could have a quick hearing,

3    because I think that's what you are asking for, an

4    opportunity to be heard, because of the disagreement that

5    your clients would have with the position that was put forth

6    by Mr. Scheimer (phonetic) on behalf of the FCC.  Then I

7    could resolve that, the tension between those positions.  I

8    wouldn't be able to do it at 3:00 tomorrow, just like I

9    wasn't able to do it today, because I only scheduled the sale

10   hearing for today.  But we could do it certainly before the

11   end of the week and have that heard.

12              MR. GWYNNE:  We would appreciate the opportunity

13   to do that.  But with respect to whether or not the TRO

14   should issue, again, we haven't given the termination

15   notice.  Whether or not the TRO should even be continued,

16   which would involve those issues, which we would be happy to

17   address at a hearing, would also involve whether or not --

18   again, Your Honor held in In Re Connectus that the Bankruptcy

19   Court couldn't use 105 to overrule the utilities' rights

20   under 366, albeit for a short time.  That was only a four-day

21   injunction that Judge Walrath entered.  Your Honor properly

22   reversed her for doing so, enjoining a utility in violation

23   of Section 366.  I think that's the same thing that is going

24   on here.

25              THE COURT:  I don't think anybody in that case,

1    and in my mind, at least at this point, who is potentially

2    distinguishable ever raised what Mr. Scheimer raised.

3              MR. GWYNNE:  Which is, Your Honor?

4              THE COURT:  His issue is about the amount of time

5    necessary for termination.  I understand your view that you

6    are not a provider in the sense that the debtor is and that

7    your relationship with the debtor is the debtor has the

8    obligation.

9              MR. GWYNNE:  Correct.

10             THE COURT:  But I don't recall the FCC appearing

11   in Judge Walrath's case.

12             MR. GWYNNE:  I don't believe so, Your Honor.

13   Frankly, as I understand it, this is the debtors' motion, not

14   the FCC's motion anyway.

15             THE COURT:  Absolutely.  But the FCC weighed in

16   on their behalf, agreeing with what other folks wanted to

17   happen when we had the hearing on December 10.

18             MR. GWYNNE:  Your Honor, the only thing we would

19   ask is during that time period prior to the hearing, who is

20   going to pay the charges that are being incurred?  We think

21   that we are entitled to that.  While Rule 65 provides that

22   the Court can enter injunctive relief and the debtor not have

23   to post a bond, if Your Honor is ordering us to provide

24   services to the GSA or some government entity or

25   quasi-government entity --

1       THE COURT:  Have you met Mr. Jonas?

2       MR. GWYNNE:  Yes, Your Honor.

3       THE COURT:  As I understand it, if his

4  transaction is approved tomorrow, he wants to talk with you

5  about that very issue.

6       MR. GWYNNE:  But I don't understand that he was

7  going to pay for postpetition charges that have been incurred

8  but not paid and enter a default now.  They are talking about

9  going forward, which I assume is from tomorrow until sometime

10  forward.

11       THE COURT:  You are talking about since December

12  10th.

13       MR. GWYNNE:  There is from the 10th to today,

14  Your Honor.  There is also charges that are due and owing

15  from prior to the 10th as well.

16       THE COURT:  I am only liable from the 10th.

17       (Laughter.)

18       I think I have immunity.

19       I am taking this seriously.  I am trying to

20  understand.  But I can't deal with before the 10th, you know,

21  in the context of what you are presenting today.  If the sale

22  is approved tomorrow, Mr. Jonas' transaction takes care of

23  that.  So we are talking about from the 10th to either today

24  or tomorrow at 3:00.

25       MR. GWYNNE:  Whenever the hearing is.  Or if the

1    sale goes forward, right.  That's correct, Your Honor.

2            THE COURT:  What we should do is, I understand

3    MCI is not going to turn anyone's phone off or service off

4    between now and tomorrow at 3:00.

5            MR. GWYNNE:  Correct.  We wouldn't have the right

6    to do it.

7            THE COURT:  Even under your analysis of the two

8    days.  So that is kind of like a no prejudice, if I enter the

9    order, because I am concerned about everybody else.

10           MR. GWYNNE:  You could carve Worldcom out.  There

11   is precedent, with all the attorneys in this room, debtors'

12   counsel, somebody will be saying to Judge Robinson, this

13   order is the standard injunction, Judge.

14           THE COURT:  I don't even understand that word,

15   precedent.

16           MR. GWYNNE:  I realize it doesn't have any

17   binding precedent.

18           THE COURT:  It really doesn't.  And this case is

19   so unusual, because of the public interest, that I would be

20   literally shocked if another judge out there said there was

21   something here to be followed in the orders I have issued to

22   get us to this hearing tomorrow at 3:00.  I guess that's

23   possible.  But actually, there is an opinion out there by

24   Judge Mansley in an asbestos case that talks about there is

25   no precedent to be followed in the same court or in different

1    courts at the same level.  But there is no precedent here.

2    This is truly a unique case.

3            MR. GWYNNE:  Since we won't be terminating, we

4    may issue a notice, but there is not going to be any

5    termination before tomorrow, could we have the hearing

6    scheduled?

7            THE COURT:  What I am thinking about doing is

8    giving you a hearing tomorrow after the sale hearing, or the

9    next day.  I don't know how long the hearing will take

10   tomorrow.

11           MR. ALBALAH:  Your Honor, may I suggest, to

12   address Mr. Gwynne's concern with respect to the injunction

13   as distinguished from with respect to getting payment from

14   the 10th until the closing of our transaction, I think his

15   concern is whether the injunction that we have asked Your

16   Honor to continue is permissible from a procedural and

17   substantive standpoint.  Therefore, I think it is necessary,

18   given that a condition precedent to our deal is to have the

19   continuation of that injunction, that this hearing be

20   scheduled at the same time or before our transaction is

21   hopefully approved.

22           Do you understand what I am addressing, Your

23   Honor?

24           MR. GWYNNE:  We could go first at 3:00.

25           THE COURT:  I understand.  But I just see it a

1  little differently.  I would take it afterwards, particularly

2  since you are going to be negotiating with them, you would

3  probably want it afterwards, too, I would think, because we

4  might have a different situation.

5           MR. GWYNNE:  I understand.

6           THE COURT:  What I am going to do is schedule you

7  for tomorrow for the agenda, but presently, my thought is

8  that I will hear any application you have subsequent to the

9  sale application.

10           MR. GWYNNE:  Thank you very much, Your Honor.

11           THE COURT:  Again, I wanted to get your position

12  clear and have some reference to what occurred previously.

13           Is there anything else you want to put on the

14  record with regard to your client's position?

15           MR. GWYNNE:  No, thank you, Your Honor.

16           MR. PALACIO:  Good evening, Your Honor.  Ricardo

17  Palacio from Ashby & Geddes on behalf of Williams

18  Communications as well as Time Warner.  I am going to address

19  the Williams Communications/Time Warner position as merely a

20  joinder to the motion to vacate and the objection to

21  preliminary injunction.

22           To start off, I would like to join in and

23  basically echo the comments made by Mr. Gwynne.  I think

24  Williams Communications, it is one of the largest carriers to

25  the debtors, has much at stake here, to say the least, as

1    such incorporates the comments of Mr. Gwynne.

2             Your Honor, there is one spin with respect to

3    Williams Communications that has been different from

4    Worldcom, and that is with respect to the notice.  In our

5    motion/objection, if you will, again, I don't know if Your

6    Honor had an opportunity to review it, but the one difference

7    I am referring to is that prior to the issuance of the TRO,

8    Williams had terminated its obligation to provide further

9    services to Winstar.  Subsequently, thereafter, after

10   terminating its obligation, it commenced the issuance of

11   notice to the appropriate regulatory agencies, both state and

12   federal level, and the time period runs anywhere from ten to

13   30 days, depending on the jurisdiction.

14            Some of those notices have already gone out.  The

15   impact of the TRO on those notices -- we understand, Your

16   Honor, we are not to cut off any service.  However, Your

17   Honor, we believe that this puts a little bit of a different

18   spin on what Worldcom has asserted, and we would again like

19   the opportunity, as I am sure many other carriers, to come

20   forward before Your Honor and seek a vacation, if you will,

21   of the TRO.

22            Quite frankly, we have the same issues with the

23   postpetition obligations, as well as the debt that is

24   incurring each and every day at this pace, we are incurring

25   approximately $170,000 a day that goes unpaid.  I think there

1  are some issues that go to the proposed, quote-unquote,

2  selling and terms of the deal, as far as any assurance of

3  being paid on a going-forward basis.

4          That is what I wanted to get on the record.  We

5  would request also that we be heard prior to the sale itself.

6          THE COURT:  Thank you.

7          MR. KIRPALANI:  Good evening, Your Honor.

8  Susheel Kirpalani of the firm Milbank Tweed Hadley & McCloy.

9  I will be very brief, Your Honor.  We appreciate the Court's

10 indulgence and your expertise in trying to facilitate this

11 transaction.

12         I wanted to confirm, Your Honor, that other

13 competing bidders will have an opportunity to outbid IDT's

14 bid provided that their 15-million-dollar deposit is within

15 Shearman & Sterling's account prior to the hearing tomorrow.

16         We have, we believe, fully negotiated a purchase

17 agreement that has been circulated to debtors' counsel as of

18 this morning.  And subject to understanding the terms and

19 conditions of the competing bid, I will contact Ms. Morgan

20 from Young Conaway.  We just wanted to make sure the record

21 was clear with respect to competing bidders.

22         THE COURT:  I don't want to get into that part of

23 it because I think it would be inappropriate.  But I

24 assume -- I don't know anything about this -- I was told that

25 there was no consummated agreement.  But if there was, you

1    should be talking with Mr. Shapiro.  And if there is 15

2    million dollars or whatever the conditions were that's been

3    deposited or wired as we were talking about a week ago and

4    that came before me, there were two competing bids, then I

5    would have to make a decision between them.

6              But I am not going to get into the detail of

7    where you are with Mr. Shapiro and the debtor.  In my view,

8    nobody is foreclosed, because I can't do that.  And if you

9    are not able to talk to Mr. Shapiro because, for whatever

10   reason, you think that you have a better offer, I assume you

11   will be here at 3:00 tomorrow to tell me what a terrible deal

12   the debtor has negotiated and why I shouldn't approve it.

13             MR. KIRPALANI:  We hope to be, Your Honor.  Thank

14   you.

15             MR. SHAPIRO:  Just to clarify the record.  I

16   don't think Mr. Kirpalani means to suggest that we had a

17   fully documented agreed-upon contract.  As he knows, there

18   are at least half a dozen or more issues that we have been on

19   the phone discussing since last Monday that haven't been

20   resolved.  So I don't think --

21             THE COURT:  As I understood it, the biggest issue

22   was they couldn't come up with the money.

23             MR. SHAPIRO:  That was a really big issue, Your

24   Honor.  They didn't come up with the money nor have they come

25   up with the money.

1          THE COURT:  So you decided it wasn't worthwhile

2    to keep talking.

3          MR. SHAPIRO:  We decided to suspend discussions

4    about 7:00 Friday night until they could show us that they

5    actually had the money.  Unfortunately, they didn't today

6    come up with the money.  I think, more importantly, if they

7    were to come up with the money between now and when we come

8    to Court tomorrow, that's just one, as Your Honor has heard

9    before, that is just one segment of this transaction.  As has

10   been expressed by IDT, there is a need to be able to show

11   that the purchase price can be paid and that the operations

12   can be funded, which are equally important.

13         THE COURT:  You would understand that because you

14   would be trying to knock out Mr. Jonas' company.

15         MR. KIRPALANI:  That's correct, Your Honor.

16         THE COURT:  He has represented that he has got

17   the wherewithal to fully perform.  But it would probably

18   behoove you, Mr. Shapiro, just to listen about those other

19   five or six issues, so that if you come tomorrow and you are

20   supporting Mr. Jonas' company's bid, that you are at least

21   prepared for what others might claim to be a better

22   transaction.

23         MR. SHAPIRO:  What I would propose, since there

24   obviously is a limited period of time between now and 12:00

25   tomorrow when we still have to try to finish a contract, and

1    we have been talking to his client now for a few weeks, we

2    are going to present a contract, as I said, at noon

3    tomorrow.  Anyone who is interested in bidding can bid off

4    that contract.  If they want to change the contract, they can

5    describe it in court tomorrow.  The IDT contract will be the

6    contract offered which other bidders can bid off, not the

7    current contract that we have been negotiating with his

8    client, because unfortunately his client didn't show up with

9    the money with which we were going to do a deal.

10              THE COURT:  That is all you are asking for.

11              MR. KIRPALANI:  Yes, Your Honor.  It is subject

12    to understanding the agreement with IDT.  Quinn Telecom

13    Holdings believes it is much more of a going-concern offer.

14    The five or six points that Mr. Shapiro mentioned were fully

15    discussed on Friday with Blackstone and Shearman & Sterling.

16    And what I meant earlier with respect to we believe those

17    issues had been resolved, in terms of documenting and

18    papering it, the agreement we circulated this morning covered

19    our offer, and we have not heard back obviously because there

20    was a lot of dealings going on today.

21              But we will certainly look at the IDT agreement.

22    If it fits outside the liquidation type agreement and it fits

23    a going-concern value type agreement, that will benefit the

24    customers and the employees, in particular, then we will

25    certainly work off of that agreement.  I have no intention to

1    recreate the wheel at all.

2            MR. SHAPIRO:  Again, for the record, what we will

3    be asking IDT to do is show up with the 15 million dollars

4    plus all of the funds that are needed to operate the business

5    for the 30-day period plus the funds for the purchase price

6    of 38 million dollars.  Anyone who chooses to show up

7    tomorrow with that much cash we would be happy to talk to.

8            MR. ALBALAH:  Your Honor, may I very briefly.

9            (Counsel confer.)

10           MR. ALBALAH:  Your Honor, this is something we

11   danced around but I want to confront now head on.  I spoke

12   very briefly with a representative of Blackstone Group.  You

13   saw me speak very, very briefly of debtors' counsel.  You

14   heard the chairman of the board of IDT Corporation.  You know

15   the financial wherewithal of my client.  The debtor, its

16   advisors, have, as Your Honor painfully knows, has been

17   spending a fair amount of time keeping the telecom providers

18   of the world at bay, waiting for --

19           THE COURT:  You just gave him more pain.

20           MR. ALBALAH:  -- waiting for Mr. Zimmerman to come

21   up with money to close the case.  Your Honor, obviously,

22   accurately portrayed why the debtor stopped that process.  We

23   are here.  We read the salient points of the agreement into

24   the record.  We are prepared to close.  We would like, as a

25   condition to that arrangement, in the event that we are

1    ready, willing, and able to close, and Mr. Zimmerman comes up

2    with the money, we view, I view, categorically, that

3    benefited the estate, I respectfully submit, there is no way,

4    to the extent that Mr. Zimmerman does come up with the money,

5    there is no way that he would have, or there is no way that

6    the estate would have been in as good of a position that it

7    will be in tomorrow but for IDT.

8                Therefore, it is customary, as Your Honor is

9    well-aware, for a reasonable breakup fee, I believe a

10   two-and-a-half-percent breakup fee, in the event that we are

11   prepared to close, is reasonable in these circumstances.  And

12   I would respectfully request that Your Honor now, so that

13   when we work literally around the clock to get this deal

14   done, we know that we are working and IDT knows that IDT's

15   professionals are working around the clock so that they

16   either get the deal or they benefit the estate.

17               MR. KIRPALANI:  Your Honor, briefly.  In terms of

18   who has been working around the clock to get us to where we

19   were, I didn't think it was IDT.  But I would not comment on

20   the breakup fee at this time.

21               MR. SHAPIRO:  Your Honor, I have never come

22   before a Court for a breakup fee without a signed contract in

23   hand.  We don't have a signed contract in hand.  I think IDT

24   is obviously showing they are interested in this, and

25   hopefully without the breakup fee they would be willing to

1      work the night to get this done.  So I would respectfully

2      disagree with counsel to IDT and say let's go forward on the

3      basis that we have previously discussed.

4              MR. ALBALAH:  Your Honor, you know better than

5      anyone because the first thing I asked you was to so order

6      the record, there is no better way -- obviously, we can't

7      manufacture documents now.  By requesting the Court to so

8      order the record, I respectfully suggest that it's clear that

9      we are ready to close.

10             When Mr. Shapiro suggests that normally there is

11     no breakup fee without a signed agreement, I agree with Mr.

12     Shapiro.  But as Your Honor correctly said, this is not the

13     normal case.  We are coming in here, we believe, I don't want

14     to be melodramatic, but we are coming in here and providing

15     excellent exit strategy for everyone, for the Court, for the

16     telecom companies, for the debtor, for the bank.

17             I submit that it is simply wrong to have IDT

18     provide that benefit without being compensated in the event

19     that the benefit that it gives the estate, the estate

20     benefits.  The fact there is no signed agreement, we are

21     prepared to so order the record.

22             THE COURT:  I know everybody is anxious and kind

23     of rushing over issues.  But you want to put a breakup fee in

24     your deal.  You have every right to negotiate that with the

25     debtor.  When that document is done at 12:00, that will

1    either be in there or not.  I don't get into that today in

2    any way.  But there is nothing that prevents you from further

3    negotiating that with the debtor.  And then your document,

4    with or without that fee, goes out for public scrutiny and

5    if -- who is the other bidder -- Mr. Zimmerman, if he decides

6    that he can qualitatively and quantitatively up your offer,

7    he will have a chance to do that and you will have your

8    breakup fee in it.

9            Again, I don't want to get into that detail,

10    because I am supposed to sit back and be objective at 3:00

11    tomorrow about whatever comes before me.  So I don't want to

12    participate.  But, I mean, you know how to get your breakup

13    fee, and it's by negotiation into your written document that

14    is going to be the subject of the 3:00 hearing.

15            MR. ALBALAH:  Actually, I respectfully submit

16    that it can't -- I don't want to -- I don't think it will

17    work that way because of the following reason.  We are here

18    tomorrow.  If Mr. Zimmerman comes up with the 15 million

19    dollars and the adequate assurance of closing and the

20    carrier, there would be no incentive -- again, I am not

21    trying to talk against my interest -- but at that point in

22    time, there would be no incentive whatsoever for the debtor

23    to support a breakup fee because the debtor, if it has the

24    assurance --

25            THE COURT:  If he does it before 12:00, you are

1   right.

2              MR. ALBALAH:  What I am suggesting --

3              THE COURT:  If Mr. Zimmerman puts more end money

4   on the table, and his -- Mr. Kenney, did you want to say

5   something?

6              MR. KENNEY:  I will wait, Your Honor.

7              THE COURT: -- that will happen.

8              MR. ALBALAH:  What I am asking, Your Honor, is if

9   we are here tomorrow, ready, willing, and able to close...

10             THE COURT:  At 3:00.

11             MR. ALBALAH:  Yes. ...and Mr. Zimmerman, or for

12  that matter anyone else, comes out of the woodwork, and the

13  debtor, which I believe is expressing a change in position --

14  it was my understanding loosely that it was the debtors'

15  opinion --

16             THE COURT:  I don't think the debtor is shopping

17  your offer.  It is just that everybody wanted to come into

18  Court and put it on the record.  In essence, they are

19  record-shopping your offer.  I guess Mr. Zimmerman knows what

20  your deal is now.

21             MR. SHAPIRO:  Maybe I can suggest something he

22  would find acceptable.  We are going to try to reach a

23  contract with them by noon tomorrow, maybe even tonight.  If

24  we have a signed contract and as Your Honor suggested if they

25  insist as a condition that there is a breakup fee, the debtor

1    if they sign that contract will be bound by that contract.

2            THE COURT:  That's right.

3            MR. SHAPIRO:  Then we have a contract upon which

4    I am comfortable coming to Your Honor and saying as part of

5    this we have a breakup fee.  Right now we have nothing.  We

6    don't have a contract.  We have an expression of intent.

7    When we get to a contract and have a breakup fee, we can come

8    before Your Honor tomorrow.

9            MR. ALBALAH:  I accept that proposal in large

10   part and I appreciate the creativity and flexibility.

11   Normally, as Your Honor knows, this would be the time the

12   Court would say, if we do that, Your Honor now approves the

13   breakup fee, because otherwise, there is no order.  Normally,

14   there are bidding procedures which contemplate a breakup fee.

15           THE COURT:  What I can tell you is if in any case

16   that comes before me somebody proposes a deal that goes to a

17   written contract and it has a breakup fee in it, and that

18   contract ultimately motivates someone else to come in and pay

19   a lot more money, they get their breakup fee.

20           MR. ALBALAH:  Thank you, Your Honor.

21           THE COURT:  I don't know what is going to happen

22   in this case, because there is no written document for me to

23   consider.

24           MR. KIRPALANI:  Nor do I think there is any

25   evidence that IDT's interest is what stirred Wintel's

1    interest in any sense.  We have always been negotiating

2    subject to obtaining financing.  IDT was at the auction just

3    like Wintel telecom was at the auction.  If there was a time

4    to start up interest, it would have occurred a long time ago.

5              THE COURT:  Write that down and tell me tomorrow,

6    if things don't go well.

7              MR. KENNEY:  Your Honor, he backed down.  I don't

8    need to say anything.

9              MR. ALBALAH:  For the record, I don't know if I

10   backed down, but the record speaks for itself.

11             MR. WHITE:  Your Honor, Bill White for

12   BellSouth.  Did I understand Your Honor correctly that any of

13   the service providers who wish to be heard tomorrow on the

14   issue of the temporary restraining order will be able to be

15   heard?

16             THE COURT:  Yes.

17             MR. WHITE:  The other issue I wanted to raise

18   with Your Honor was this particular proposal that the Court

19   indicated would be available at noon with a hearing at 3:00,

20   I don't see realistically how the carriers will be able to

21   review that proposal, particularly to be able to consult with

22   their clients to determine whether they would oppose that.

23             This particular proposal, the scheduling of this,

24   alters even the bid procedures order, which itself was fairly

25   truncated.  I am concerned about, particularly in light of

1   the supplemental motion that was filed by the debtor over the

2   weekend, that the carriers that I have discussed it with have

3   a number of problems because of the potential for the

4   assumption and assignment of contracts under the guise of the

5   sale of assets.

6           So I can only say that I think that three hours

7   notice for a deal to the service providers who are the

8   biggest constituency that are going to be affected by this is

9   too short.

10          THE COURT:  All right.  Thank you.

11          MR. SHAPIRO:  Just in response to that, Your

12  Honor.  I think the salient points of the deal were put on

13  the table tonight.  He obviously can get in touch with his

14  client and has the better part of tomorrow.  Obviously, it is

15  very short.  On the other hand, I think that this is a deal

16  that if we can make it happen, it is in everyone's interest,

17  and therefore he ought to take the name of counsel to IDT and

18  have his client speaking to them between now and 3:00

19  tomorrow.

20          MR. PALACIO:  Your Honor, I apologize.  On behalf

21  of Williams.  Your Honor, I just want to touch on that last

22  point briefly.  What they are doing when they say the salient

23  terms have been discussed, what their salient terms are, at

24  least one of them is a de facto assumption and assignment.

25  There is a big issue there.

1          A lot of the telecoms, a lot of the other

2    creditors in this case, for lack of a better word, have an

3    issue there.  So by saying there is salient terms, get in

4    contact with somebody, we are talking about 18 hours really

5    to hammer out their differences.  And you are not talking

6    about a couple thousand dollars.  You are talking millions

7    and millions of dollars here.

8          When they sent out their cure objection notices,

9    if you will, with respect to Williams, they said, certain

10   contracts, we had no idea what contracts they are talking

11   about.  It is something that is not that easy.  That is the

12   one issue I wanted to highlight for Your Honor before we go

13   on this course, if you will, of contacting them and see if

14   you can work something out by tomorrow.

15         The second is merely a request for Your Honor,

16   that is with respect to my co-counsel, who flew from

17   Oklahoma, has since left, has asked to the extent Your Honor

18   is inclined to grant a hearing on the TRO, which Your Honor

19   has, that he be able to participate telephonically.

20         THE COURT:  Well, I have to be careful about

21   that, because the numbers of people that are involved, I

22   don't know if we can do that.  But to the extent we can,

23   mechanically, I will allow it.

24         MR. PALACIO:  Thank you, Your Honor.

25         MR. SHAPIRO:  Your Honor, to address the point.

1  I don't think there is any intention of assuming or assigning

2  any contracts whatsoever tomorrow.  That is not the game

3  plan.  The game plan is to close a contract with the buyer.

4  The buyer would then have the right for a period of time to

5  determine which contracts it wants to assume and have assumed

6  and assigned to it or not have assumed and assigned to it.

7          In the meantime, as I think you heard, the buyer

8  understands that they are picking up all accruals that would

9  occur from the time they take over the business, the closing

10  date, forward, they are not picking up any arrearages.  We

11  are talking about nobody having to deal with the notice

12  period for a cure amount tomorrow or anything like that.  We

13  are talking about that being done in the future if and to the

14  extent the buyer determines that any of the contracts should

15  be assumed and assigned.

16          MR. PALACIO:  Your Honor, with all due respect to

17  Mr. Shapiro, my point is to the extent this sale goes

18  through, one of the terms there requires that the service

19  providers continue and are obligated to provide service.  If

20  that is the case, they are basically taking that obligation

21  that is already there and transferring that pursuant to a

22  sale.  You can't have a sale without an assumption and

23  assignment.  That is my point.  Then there is a cure issue

24  there.

25          MS. SAWCZUK:  Your Honor, Maria Sawczuk on behalf

1    of Eastwire (phonetic) Communications.  I will be very

2    brief.

3              I wanted to bring it to Your Honor's attention

4    that I believe Eastwire is the only service provider at this

5    point that is also in bankruptcy.  So to the extent any of

6    these negotiations affect or change or modify the claims that

7    Eastwire has in this bankruptcy, it may be necessary -- I am

8    not going to opine on this at this point because I am not

9    entirely sure how it is going to be affected -- it may be

10   necessary to bring those changes to our Bankruptcy Court for

11   approval.  We do have a fiduciary duty to our creditors in

12   our case.

13             THE COURT:  Where are they in bankruptcy?

14             MS. SAWCZUK:  Here, Your Honor, in front of Judge

15   Katz.

16             THE COURT:  All right.

17             MR. LADDIN:  Good evening, Your Honor.  Daryl

18   Laddin on behalf of Verizon.

19             Your Honor, I am here before the Court because

20   Verizon is owed over five million dollars in postpetition

21   administrative expenses that remain unpaid, despite an order

22   that this Court previously entered in the case.  At the

23   outset of the case, Verizon entered into a stipulation under

24   Section 366 with the debtors that required semi-monthly

25   prepayments, and also gave Verizon the right to terminate

1    service on two business days notice in the event that

2    payments were not made.  The debtor failed to make those

3    payments on several occasions.  Verizon worked with the

4    debtors, continued to try to work with the debtors, the

5    debtors continued to fail to pay.  As a result of that, we

6    are now here being owed over five million dollars.

7            Your Honor, I am very concerned with the

8    procedural posture that we are in here.  In particular,

9    without reiterating what Mr. Gwynne had to say, I would like

10   to state that Verizon does join in the comments and objection

11   of MCI Worldcom.

12           In addition to that, Your Honor, we have

13   significant concerns about the due process with respect to

14   this particular sale.  As I understood Your Honor's comments

15   during the meeting with the debtors earlier, Your Honor had

16   denied the sale motion because there was no bidder.  The sale

17   that has just been discussed with the Court here is not the

18   subject of a motion.  It has never been noticed.  There is no

19   opportunity for any of the carriers, including Verizon, to

20   review the terms of the sale.  And it is not reasonable to

21   require any party in interest to review the terms of a

22   contract on what will amount to less than three hours notice

23   and be able to address all of the issues.

24           Substantively, I would expect quite a few

25   objections, including, in particular, the injunction that

1    apparently the purchaser is asking the Court to issue.  I

2    will acknowledge for the Court that there is a difference

3    between issuing an injunction against service providers based

4    upon the request of the FCC for the concerns of the FCC -- as

5    I understand, that was a significant reason why the Court

6    entered the initial injunction -- there is a significant

7    difference between that and issuing an injunction that

8    benefits the purchaser in this case as well as the banks,

9    particularly if they are going to request that that

10   injunction be issued if there are any unpaid administrative

11   expenses.  I would expect that issue to be raised tomorrow,

12   and we would expect that to the extent that they are seeking

13   to be paid -- excuse me, to receive service during any period

14   subsequent to tomorrow, that they pay all of the past due

15   administrative expenses that are owed.

16              THE COURT:  Just so the record is clear, we came

17   here for a sale hearing today.  I was informed by the debtor

18   there was no sale.  So I said procedurally what I was

19   prepared to do is deny their motion as moot but I would

20   reconsider if the debtor got to me any information that there

21   was somebody around the courtroom that wanted to make a

22   proposal.  And that's what happened.  So the procedural

23   status of the sale motion is that it's not denied, because

24   the offer of Mr. Jonas' company is still pending, and the

25   hearing is continued till tomorrow.

1          MR. LADDIN:  For the record, I would go ahead and

2    state my objection for the record on due process grounds

3    going forward with the hearing tomorrow.

4          THE COURT:  Okay.

5          MS. SILVERSTEIN:  Laurie Silverstein on behalf of

6    certain affiliates of SBC.

7          I would join in Mr. Gwynne's comments with

8    respect to the issuance of the TRO.  And I would also add

9    that I was in the courtroom at the last hearing, and it was

10   my understanding that the sale hearing and the TRO were being

11   put over until today, and I believed the hearing to be

12   adjourned and left with my client, only to find out

13   subsequently that a TRO was entered.  So we were here at the

14   time, but since the TRO was put over until today we left.  I

15   don't know what comments were made by the FCC.  I did not

16   receive any notice of the TRO hearing prior to being in

17   court.  And I also believe there are significant procedural

18   issues with respect to the entry of the TRO.

19         I also agree that there are procedural issues

20   with respect to going forward with the sale hearing on a

21   completely different as yet undocumented sale motion.

22         One salient point that I would like clarified,

23   because it has now come up twice during the discussions that

24   have happened, is that the buyer will be taking on the

25   going-forward obligations from the closing date.  That's what

1    I keep hearing.  I don't know when the closing date is going

2    to be.

3                    THE COURT:  You will hear about that tomorrow.

4                    MS. SILVERSTEIN:  That is a salient term.  If

5    they know, we would like to hear today, if it is different

6    than tomorrow.

7                    THE COURT:  The hearing that was scheduled for

8    today is adjourned until 3:00 tomorrow, which includes the

9    sale and the temporary restraining order.  When I was told

10   there wasn't a sale, there was a discussion of how we would

11   have a hearing that would consider all the interests that

12   would be affected by a conversion to Chapter 7.  So I

13   adjourned the hearing on the basis of that information to

14   3:00 tomorrow by teleconference.

15                   Then I was advised that there was the possibility

16   of a sale.  So all I have done is adjourned it to an open

17   hearing in the courtroom at 3:00 tomorrow, because it appears

18   we are not in a conversion mode, unless I am misunderstanding

19   something.  To get to that, in either instance, we had to

20   extend the TRO another 24 hours, until tomorrow.  But all

21   those issues about what is in the deal, I assume, will be in

22   the document and you can get it at 12:00 tomorrow.

23                   MR. SHAPIRO:  The debtor agrees with Your Honor's

24   position.  It's clear that we came to Court hoping to come to

25   Court at some point today with a sale.  We didn't think we

1    had one this morning.  Now we may have one.  We are

2    continuing and adjourning the hearing until tomorrow and we

3    will find out tomorrow whether in fact we do.  And we will

4    address all the issues that people will be raising tomorrow

5    once they have an opportunity to see the contract.

6              THE COURT:  If there is no transaction to be

7    considered at 3:00 tomorrow, then we will go forward with the

8    premise that the teleconference was going to be, and that

9    would be to consider with the United States Trustee the

10   conversion.

11             MR. SHAPIRO:  I agree, Your Honor.

12             THE COURT:  Rather than be on a teleconference,

13   we will come here at 3:00 and consider that.

14             MR. SHAPIRO:  Hopefully Pauline Morgan has a lot

15   of space in her house tonight.

16             THE COURT:  We are going to -- unless somebody

17   has something that is different from what we have been

18   talking about...

19             MS. MELNIK:  Selinda Melnik for Lexend

20   (phonetic).

21             We had put on a motion for today on shortened

22   notice because of this hearing, and I was wondering whether

23   that would be put over not until tomorrow but to the omnibus

24   hearing on Thursday.  I wanted to clarify that.

25             THE COURT:  The only thing that was to be heard

1    today was the sale motion and a reconsideration of any

2    comments that folks wanted to make with regard to a TRO.

3    There was nothing else really on the agenda.  We are going to

4    move to tomorrow.  But anything else will be heard at a

5    to-be-scheduled omnibus hearing, because I am not sure what's

6    going to happen tomorrow that it would make any sense to have

7    an omnibus hearing on the 20th.  It's still possible this

8    case could go to Chapter 7 tomorrow.

9            MS. MELNIK:  I don't think that would moot our

10   motion, no.

11           THE COURT:  No.  But it would put it in a

12   different context.  And the Trustee, the reason why we

13   couldn't consider that information today is because the

14   United States Trustee has to find somebody to come in.

15           MS. MELNIK:  There may or may not be an omnibus

16   hearing on the 20th.

17           THE COURT:  There won't be for sure, because I

18   don't think -- Mr. Kenney, you can help us -- are you able --

19   I thought that was part of the stress of doing anything

20   today, because we have to get somebody to come in.

21           MR. KENNEY:  Your Honor, we do.  We might be able

22   to do it in a couple days.  But I know, if I get a trustee in

23   even this week, the trustee is not going to be able to

24   respond to Ms. Melnik's motion.

25           THE COURT:  So I don't think the 20th is going to

1    be a day that anything can be done.  So we are going to focus

2    on tomorrow and see what happens.  If it is a sale -- it

3    would be different than if it is converted.  And then if it

4    is converted, he will have to get somebody that can be --

5                 MS. MELNIK:  So we will take one day at a time.

6                 MR. JESSUP:  Douglas Jessup on behalf of Univance

7    (phonetic), Your Honor.  I flew out from Denver last Monday

8    coming for a sale.  I flew out again for a sale.  I will

9    probably stay overnight and wait for another sale.  I did

10   have last week set a motion for adequate assurance, Your

11   Honor.  Obviously, this is all moving very quickly, and we

12   did also have it set today.  I was one of the other motions

13   that was set today at 2:30.  I think we ought to roll that

14   over to tomorrow, if that is possible, Your Honor.

15                What I am faced with and what I have learned in

16   this whole process is the FCC came in and said we are going

17   to need 31 days to shut things down, and therefore, carriers,

18   you are going to have to go along with that, and we are all

19   scrambling to figure out who is going to pay for that and

20   things like that.  Now we have a new party who says they will

21   pay for things going forward, although I have not

22   heard -- they have left open when they get to terminate.

23   What I don't want to see is, they dance together for 45 days,

24   60 days, they say they are out of here and by the way send

25   their termination notice.  Now we are right back to where we

1  started again, 30 days, with nobody paying for it again.  It
2  has all kind of come to a head on this.  I bring that to your
3  attention, Your Honor, and also ask for my motion to be
4  continued.
5              THE COURT:  The motion was put on, again, the
6  agenda, without my agreement to hear those kind of matters
7  today.  You can present any kind of a position that you want
8  in response to whatever sale is proposed to be heard
9  tomorrow.  But again, if there is no sale tomorrow, then the
10 context is much different.  So I don't want to hear anything
11 in the nature of adequate assurance if there is going to be a
12 trustee appointed by the United States Trustee.
13             MR. JESSUP:  Agreed, Your Honor.
14             THE COURT:  Everybody here is sophisticated
15 enough to understand that there would have been a great
16 difference today if we continued with no buyer in a whole lot
17 of ways.  And we are still not sure that there is a buyer.
18             MR. JESSUP:  Your Honor, I feel the same way.
19 That is why we are trying to protect ourselves, trying to
20 understand what is going on.  I would also join in the other
21 comments of the carriers' counsel.  Thank you, Your Honor.
22             MR. SHERMAN:  Andrew Sherman, Seals Cummis, on
23 behalf of Qwest Corporation and Qwest Corporation
24 Communications.
25             We join in the comments by the other telecoms.

1           Your Honor, one point we would like some

2    clarification on is what contracts will the debtor be

3    assuming or will the purchaser be utilizing from the closing

4    date forward.  We still have yet to be supplied with a list

5    of contracts.  And if there is going to be this, quote,

6    management agreement, we need to know what business the

7    purchaser is going to manage, meaning what are the

8    contracts.  And if that list can be provided by tomorrow at

9    12:00, at least that might get some type of notice out to the

10   counter-parties to the contract of what --

11           THE COURT:  I don't think they are going to have

12   that tomorrow.  I think they contemplated, I will let Mr.

13   Shapiro a little bit -- when the presentation was made, my

14   understanding is that that was what they were going to do

15   between tomorrow and the presentation to the state and

16   federal regulatory authority.

17           MR. SHAPIRO:  Let me try to explain how I think

18   it would work.  This is again really the buyer's

19   transaction.  As I understand it, the buyer will not be

20   seeking to assume and assign any contracts tomorrow.  So the

21   debtor will continue to utilize let's say the transaction

22   actually closed after Your Honor entered an order tomorrow

23   immediately, so on Thursday, or Wednesday or Thursday, the

24   buyer will have bought the equipment.  Obviously, the

25   licenses won't be transferred, the customers won't be

1    transferred until subsequent regulatory approval by the FCC

2    and the appropriate states.

3              However, in the interim, as we have heard, the

4    buyer intends to operate the business and has said they will

5    continue to pay all the ongoing costs of operating the

6    business.  To the extent that the buyer continues to use the

7    services of Mr. Sherman's client, Qwest, then they would have

8    to pay on a current basis, on a go-forward basis from the

9    closing forward for those services.

10             THE COURT:  As I understood it, they were going

11   to escrow some funds.

12             MR. SHAPIRO:  They agreed to put 30 million

13   dollars in escrow to support their obligation to do so.  If,

14   however, three days into their ownership they decide to

15   terminate the Qwest relationship, then they would obviously

16   have to give Qwest notice and have to terminate and stop

17   paying --

18             THE COURT:  While that process was occurring,

19   they would be getting paid from the escrow funds.

20             MR. SHAPIRO:  Correct.

21             MR. SHERMAN:  We can address it tomorrow.  Who is

22   going to be the party to our contract subsequent to this?  Is

23   the debtor going to remain on the hook or is it going to be

24   the purchaser?  As the purchaser, there has to be a formal

25   assumption and assignment.  There has to be a cure.

1          THE COURT:  It sounds to me like they are both on

2     the hook, but the debtor has no money.  It's the purchaser,

3     and once they notice you, either for, it would be an

4     assignment, you will have an opportunity to come in and

5     object to that assignment.  And if they reject you, you have

6     an opportunity to come in, being paid till that point, and to

7     present your cure.

8          MR. SHERMAN:  I guess everybody can imagine what

9     will happen is they will not give that notice of assignment

10    for 60 days, allow the carriers to continue to provide

11    service, then on the 60th day or whatever they decide to

12    reject, again, you have sort of abdicated or pushed off the

13    rights the telecoms, including Qwest, has under 365.  We can

14    get into that tomorrow.

15         THE COURT:  Well, again, it would depend on the

16    agreement and what the time frames of the agreement are and

17    the amount of money and what determination I will make that

18    they have protected companies like your client.

19         MR. SHERMAN:  The last point, Your Honor, I guess

20    we will get into it tomorrow, it appears the debtors seem to

21    be transferring their rights under 366 to the purchaser.  In

22    essence, the carriers will be forced to begin anew under this

23    management arrangement, with no deposit or otherwise, and

24    again, we are going to be providing full services, I think

25    the management agreement had a five-day cure.  And again, we

1   will reserve those rights and more likely than not object to

2   that tomorrow.

3           THE COURT:  Well, what would happen to your

4   client if tomorrow I signed a conversion order and I continue

5   the injunction till I feel comfortable with the evidence that

6   I have relied on from the FCC that you not terminate?  How

7   long could you be pushed out then, with no money?

8           MR. SHERMAN:  As long as Your Honor continues the

9   injunction.  That is up to Your Honor's discretion, I

10  imagine.

11          THE COURT:  But assuming it's the 31 days, I am

12  not so sure you are in a better situation there.  That is

13  your best situation without a purchaser.

14          MR. SHERMAN:  That could be.

15          THE COURT:  How much would your client lose in 35

16  days?

17          MR. SHERMAN:  Over a million dollars.  A

18  million-five.  But at that point, we would know there would

19  be a finite date and that services would terminate if the

20  arrangement -- we can deal with it if in the sale continues.

21          THE COURT:  I guess my point is, I don't think

22  that that finite amount of money changes whether you get 60

23  days and get paid or whether you get it tomorrow.  That is

24  why I am having a hard time understanding the position.

25          MR. SHERMAN:  Well, first, we are not assured,

1   and I understand --

2           THE COURT:  You would like to get out of this

3   Winstar situation as quickly as possible, I understand that.

4   But absent that, I don't see your exposure shifting in any

5   way from that outside amount of money, based on what I know

6   from what I have heard from the FCC to date.

7           MR. SHERMAN:  We are continuing to provide

8   services, yes, you will have a guarantee of IDT, I guess

9   however they are going to phrase it, in the document.  But --

10          THE COURT:  I think it is more than a written

11  guarantee.  I think it is a cash guarantee.  They are going

12  to put money in the bank.  If that starts to run short, I

13  assume you can run back in here and tell me, Judge, there is

14  not enough money in there, we need more.  And I would tell

15  Mr. Jonas to ante up because things are taking longer, if you

16  want to stay in that game or your 31 days or 35 days would

17  kick in because I wouldn't enjoin you any longer.

18          But again, I don't see how the outside gets any

19  worse than five or six days for you.

20          MR. SHERMAN:  Maybe it's semantics or if it was

21  structured as a prepay, this 30 million dollars, you started

22  a prepay arrangement with the various carriers, that might

23  gives the carriers a little more comfort on a go-forward

24  basis.  Just to have the 30 million sit there in escrow and

25  you have to apply for it and be paid in arrears is different

1    than the arrangement we negotiated with the debtor --

2            THE COURT:  I understood it to be an ongoing

3    thing.  We will see tomorrow when they present the document.

4    But I think you got to focus on that potential of a 30- to

5    40-day loss is out there no matter, and what saves you from

6    that is a deal.

7            MR. SHERMAN:  That is one perspective and maybe

8    my client will disagree with that.  Maybe, as Your Honor

9    said, they want to get out of this situation.

10           THE COURT:  Because it is unsettled and I can

11   understand that.

12           MR. SHAPIRO:  Your Honor, I suggest we need to

13   resolve all these things in the contract.  We haven't reached

14   agreement on all these points.  We will reach agreement,

15   hopefully get a document.

16           THE COURT:  You are getting some information of

17   what could help you work through.

18           MR. SHAPIRO:  It is helpful to know people's

19   concerns.  We anticipated these concerns, and we will be

20   address them tomorrow.

21           THE COURT:  Anyone else want to be heard?

22           We will be in recess until 3:00 tomorrow.

23           (Hearing concluded at 7:05 p.m)

24                         - - -

25   Reporter:  Kevin Maurer

I hereby certify that these shorthand notes
are, to the best of my skill and ability, true
and accurate notes of the proceedings con-
tained therein.

Official Court Reporter
U. S. District Court